## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **P.J. SAUNDERS** *as next friend and guardian of* **R.S., and REED SAUNDERS,** | |
| **Plaintiffs,** | |
| **v.** | Case No. 19-2538-DDC-TJJ |
| **USD 353 WELLINGTON, et al.,** | |
| **Defendants.** | |

### MEMORANDUM AND ORDER

This case features tough facts, numerous claims, and complex issues of federal and state law.  It arises from defendants' alleged mistreatment of a severely disabled public-school student named Reed Saunders.  Plaintiffs allege that school district employees used sundry forms of physical force on the student over a period of years leading up to a public incident at a school basketball game.

After deep consideration of the questions that the parties present in their four pending motions, the court is prepared to rule.  *First*, the court explains its decision to deny defendant USD 353's Motion to Dismiss (Doc. 92).  *Second*, the court reviews defendants Tammy Moore and Brenda Gray's Motion to Dismiss (Doc. 96) and explains the reasons it grants that motion in part and denies it in part.  *Finally*, the court turns to defendant Robin Creamer's and plaintiffs' respective Motions for Summary Judgment (Doc. 94 and Doc. 101).  The court grants defendant Creamer's motion in part and denies it in part.  And then the court grants plaintiffs' own

summary judgment motion.  The court now provides some fuller background about the motions and supporting briefing before turning to the motions' merits.

## I.      Procedural Background

Four dispositive motions are pending in this case.  They stem from the Third Amended Complaint (Doc. 90) that plaintiffs filed on June 18, 2020.  The court briefly outlines the motions and their associated briefs.  This outline forecasts the sequence in which this Memorandum and Order considers the motions.

*First*, defendant USD 353 filed a Motion to Dismiss (Doc. 92) and a corresponding Memorandum in Support (Doc. 93).  Plaintiffs filed a Response (Doc. 99).  And defendant USD 353 filed a Reply (Doc. 103).

*Second*, defendant Creamer filed a Motion for Summary Judgment (Doc. 94) and a Memorandum in Support (Doc. 95).  Plaintiffs filed a Memorandum in Opposition (Doc. 98).  And defendant Creamer filed a Reply (Doc. 107).

*Third*, defendants Moore and Gray filed a Motion to Dismiss (Doc. 96) and a Memorandum in Support (Doc. 97).  Plaintiffs filed a Response (Doc. 100).  Then defendants Moore and Gray filed a Reply (Doc. 105).

*Finally*, plaintiffs filed a Motion for Summary Judgment against defendant Creamer (Doc. 101) and a Memorandum in Support (Doc. 102).  Defendant USD 353 filed a Response (Doc. 110).  So did defendant Creamer (Doc. 111).  Plaintiffs filed a single Reply (Doc. 112).

The court now turns to the two motions to dismiss.  The court begins by reciting the factual background pertinent to these motions.

**II.      Motions to Dismiss (Doc. 92 and Doc. 96)**

**A.      Factual Background for the Motions to Dismiss**

The following facts come from plaintiffs' Third Amended Complaint (Doc. 90).  The court accepts as true all well-pleaded allegations and views them in the light most favorable to plaintiffs.  *SEC v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014).

**1.    Reed Saunders's Disabilities**

Plaintiff Reed Saunders is a student within the USD 353 public school district in Wellington, Kansas.  Doc. 90 at 2–3 (Third Am. Compl. ¶¶ 8, 12).  He "stands approximately five-feet tall and weighs approximately seventy-five pounds."  *Id.* at 2 (Third Am. Compl. ¶ 6). He is "incapacitated and suffers from severe mental retardation, a compromised spine, cerebral palsy, chronic lung disease, blindness, developmental disabilities and a seizure disorder."  *Id.* (Third Am. Compl. ¶ 4).  And he scores "below the first percentile in IQ, and has been estimated to function at [an] age range of 1 to 3 years old."  *Id.* at 8 (Third Am. Compl. ¶ 40).  Reed Saunders "cannot communicate verbally and can only use limited sign language.  He requires complete support to perform the activities of daily living" including "eating, communicating, mobility, dressing, using the bathroom and thinking."  *Id.* at 2–3 (Third Am. Compl. ¶¶ 5, 14). To move around, Reed Saunders "must use a walker to ambulate and a wheelchair to cover long distances, and with either mode of transportation, completely relies on the assistance of responsible caretakers."  *Id.* at 2 (Third Am. Compl. ¶ 7).

**2.    Reed Saunders's Experience at USD 353 Before January 2019**

Reed Saunders attended public school in Kansas.  His school was one in USD 353, a Kansas public school district that is based in Wellington, Kansas, and receives federal funds.  *Id.* at 2 (Third Am. Compl. ¶ 8).  The school district employed several people named as defendants

in this lawsuit:  Robin Creamer, Tammy Moore, and Brenda Gray.  *Id.* at 2–3 (Third Am. Compl. ¶¶ 9–11).  Defendant Gray is a teacher.  *Id.* at 5 (Third. Am. Compl. ¶ 22).  She has two para-educators under her direct supervision:  defendants Creamer and Moore.  *Id.*  Defendant Gray was responsible for (1) directly supervising defendants Moore and Creamer and (2) maintaining compliance with the policy and training requirements for para-educators under her supervision. Id. at 26 (Third Am. Compl. ¶¶ 138–39).

Plaintiffs allege that defendant "Gray was mismanaging paraeducators working beneath her and endorsing terrible methods of interacting with Reed Saunders, including pouring cold water on erections, biting him, sitting on him and using military-style pressure points; in addition, not managing her classroom in safe manner[.]"  *Id.* at 15 (Third Am. Compl. ¶ 83) "Each of these concerns about Gray had been reported to the school district by Plaintiff P.J. Saunders or outside agencies to administrators."  *Id.*

In October 2015, plaintiff P.J. Saunders reported several concerns to USD 353 administration.  She reported (1) "that Brenda Gray had not been maintaining safe classrooms for Plaintiff Reed Saunders and other students due to her demonstrated inability to supervise para-educators and children[,]" *id.* at 6 (Third Am. Compl. ¶ 30); (2) "that Brenda Gray had been pouring cold water on Plaintiff Reed Saunders'[s] genitalia[,]" *id.* (Third Am. Compl. ¶ 27), and (3) "that a para-educator under Brenda Gray's supervision had been using martial-arts style pressure points to control Plaintiff Reed Saunders'[s] behavior with pain[,]" *id.* (Third Am. Compl. ¶ 28).  "In 2015, USD 353 administration also received notice from outside agencies of Brenda Gray's para-educator's use of pressure-point tactics."  *Id.* (Third Am. Compl. ¶ 29). "The military style pressure points tactics cause appreciable and immediate pain upon Reed Saunders . . . ."  *Id.* at 13 (Third Am. Compl. ¶ 74).

In the following years, P.J. Saunders reported other concerns about her son's treatment at school. She "had reported to Defendant Gray and other USD 353 employees in April of 2017 and the Summer and Fall of 2018 that she was concerned about how Defendant Gray's subordinates physically treated Reed Saunders, including dragging him along by the walker." *Id.* at 13–14 (Third Am. Compl. ¶ 77). On August 25, 2017, Reed Saunders "was discovered to have sustained unexplained bruising in a location on his body where it could not be self-inflicted, and sustained while he was under the supervision of" USD 353. *Id.* at 13 (Third Am. Compl. ¶ 75).

"Plaintiff P.J. Saunders on multiple occasions in 2018 told USD 353 supervisors that Defendant Creamer and Moore should not be dragging Reed Saunders along by his walker, as such conduct, besides being offensive, could damage his delicate, surgically repaired spine." *Id.* at 7 (Third Am. Compl. ¶ 37). "Plaintiff P.J. Saunders had reported similar conduct to their supervisor and informed the Defendant School District that this conduct could damage Reed's surgically repaired spine . . . ." *Id.* at 8 (Third Am. Compl. ¶ 39). Sometime before "January of 2019, USD 353 administrators had also received reports from other USD 353 employees that Brenda Gray had trained her para-educators to bite or sit on children under their supervision." *Id.* at 6 (Third Am. Compl. ¶ 31).

### 3. January 2019 Gymnasium Incident

While a USD 353 student, Reed Saunders attended a school district-sponsored basketball game on January 18, 2019. *Id.* at 5 (Third Am. Compl. ¶¶ 20–21). At that time, defendants Gray, Moore, and Creamer had undertaken the care and custody of Reed Saunders. *Id.* (Third Am. Compl. ¶ 22). Reed Saunders had been sitting "entirely helpless in his wheelchair" and "did

nothing to warrant or provoke any physical restraint or beating . . . ." *Id.* at 9 (Third Am. Compl. ¶ 48).

Reed Saunders was sitting "entirely helpless in his wheelchair" when defendant "Creamer struck Reed in an angry manner . . . ." *Id.* at 9, 11 (Third Am. Compl. ¶¶ 48, 61). The boy "did nothing to warrant or provoke any physical restraint or beating by Creamer . . . ." *Id.* at 9 (Third Am. Compl. ¶ 48). When defendant "Creamer struck Reed, she caused him immediate physical injury and physical pain." *Id.* at 11 (Third Am. Compl. ¶ 60). Her "conduct occurred in full view of the gymnasium, including her USD 353 supervisor, Defendant Gray." *Id.* at 10 (Third Am. Compl. ¶ 55). Defendant "Creamer's actions at all times were under the supervision of USD 353 supervisor Brenda Gray." *Id.* at 6 (Third Am. Compl. ¶ 25).

"Education professionals from other schools in attendance at the game who observed Creamer's conduct . . . described Creamer's action as 'battery at best.'" *Id.* at 9 (Third Am. Compl. ¶ 50). "A teacher, A.L., from a different high school who had previously worked with Reed, was in attendance at the basketball game and witnessed Creamer strike Reed's arms and yell at him and shout at him: 'You know you don't want to make me mad!'" *Id.* at 9–10 (Third Am. Compl. ¶ 51). "Teacher A.L. intervened at that point, and went to soothe Reed, who was distraught in his wheelchair." *Id.* at 10 (Third Am. Compl. ¶ 53). "As Teacher A.L. soothed Reed, Defendant Creamer again aggressively pushed Reed's hand down and shouted at him." *Id.* (Third Am. Compl. ¶ 54).

"After Teacher A.L. intervened, Defendants Creamer and Moore together held both of Reed's arms down, then transferred him to his walker from his wheelchair, and then both Creamer and Moore together drug Reed into a bathroom by the walker, an action they knew could hurt him." *Id.* (Third Am. Compl. ¶ 57). Reed Saunders "is not capable of 'bad behavior'

and would not have understood Creamer or Moore's conduct as 'punishment,' or understand why the punishment was occurring." *Id.* at 9 (Third Am. Compl. ¶ 49). "Reed felt horror while he was being restrained by Defendants Creamer and Moore and was unable to move at all, or communicate, or comprehend . . . why it was happening." *Id.* at 11 (Third Am. Compl. ¶ 62). "When Defendant Creamer held down Reed Saunders'[s] arms," she prevented him from communicating because his arms "served as his only way of communicating . . . ." *Id.* at 8 (Third Am. Compl. ¶ 42). "Defendants Creamer and Moore physically restrained Saunders repeatedly over the course of more than an hour, with the restraints lasting minutes, but occurring repeatedly during that time." *Id.* at 9 (Third Am. Compl. ¶ 45). "Defendants Creamer and Moore and Gray each had an opportunity and the means to intervene and help him." *Id.* at 12 (Third Am. Compl. ¶ 69). "But while members of the public sought to intervene and help Reed, the people whose job and duty it was to help and care for Reed—Defendants Creamer, Moore and Gray—either took no action or affirmatively joined in . . . ." *Id.* (Third Am. Compl. ¶ 70).

"Other School District students with developmental disabilities and physical limitations, who were also under the supervision of Defendants Creamer and Moore and/or Gray, who were present at the same basketball game, and who similarly had not engaged in and/or were not capable of any conduct that would warrant a 'punishment,' and who were materially similar to Reed in all other respects, were not struck, threatened, shouted at, and did not have their arms pinned, and were not dragged into a bathroom." *Id.* at 11–12 (Third Am. Compl. ¶ 65).

### 4. Aftermath

"Teacher A.L. subsequently sent an email to the Defendant School District, documenting what she observed and stating:

[T]he staff does not realize their behaviors are unacceptable.  This is not the way students with these severe of need or any student should be treated.  I did not have these problems with Reed when I had him.  Even if he is being aggressive he is not able to physically go after people so they could just get out of his way or get behind him."

*Id.* at 10 (Third Am. Compl. ¶ 56).

"Defendant Creamer's conduct was reported as child abuse; she was criminally investigated and charged with battery."  *Id.* at 10 (Third Am. Compl. ¶ 58).  "On August 23, 2019, Defendant Creamer plead[ed] guilty in Sedgwick County to a Class B Misdemeanor charge of Battery stemming from her conduct with Reed and was placed on probation."  *Id.* at 11 (Third Am. Compl. ¶ 59).

"Following Creamer's conduct, Reed Saunders'[s] behavioral issues worsened for him— he increased banging his head and self-biting behaviors, and he began refusing food at school."  *Id.* (Third Am. Compl. ¶ 63).

### B.    Legal Standard

Federal Rule of Civil Procedure 8(a)(2) provides that a Complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Although this Rule "does not require 'detailed factual allegations,'" it demands more than a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, the Supreme Court has explained, "'will not do.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

 When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must assume that the Complaint's factual allegations are true.  *Id.* (citing *Twombly*, 550 U.S. at 555).  But the court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).  "'Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice'" to state

a claim for relief. *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010) (quoting *Iqbal*, 556 U.S.

at 678). The Complaint's "[f]actual allegations must be enough to raise a right to relief above

the speculative level[.]" *Twombly*, 550 U.S. at 555 (citations omitted).

To survive a motion to dismiss under Rule 12(b)(6), a Complaint "must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556

U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The

plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer

possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556); *see

also Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1192 (10th Cir. 2009)

("The question is whether, if the allegations are true, it is plausible and not merely possible that

the plaintiff is entitled to relief under the relevant law." (citation omitted)).

Next, the court considers whether plaintiffs' allegations satisfy this pleading standard.

### C.   Defendant USD 353's Motion to Dismiss Plaintiffs' Third Amended Complaint (Doc. 92)

Plaintiffs assert six claims against the school district—two federal claims and four

Kansas state law claims.[1] The federal claims include: (1) a § 1983 claim (Count I) and (2) a

Rehabilitation Act claim (Count VI). The Kansas state law claims under the Kansas Tort Claims

---

[1]     When exercising supplemental jurisdiction over a state law claim, this court is obligated to apply
Kansas choice-of-law rules. *BancOklahoma Mortg. Corp. v. Capital Title Co., Inc.*, 194 F.3d 1089, 1103
(10th Cir. 1999) (explaining that when "a federal court exercises supplemental jurisdiction over state law
claims in a federal question lawsuit[,]" the court "applies the substantive law, including choice of law
rules, of the forum state"). The Third Amended Complaint brings the state law claims under Kansas law.
Doc. 90 at 1 (Third. Am. Compl. ¶ 1). And all parties argue that Kansas law applies to the state law
claims. So, the court applies Kansas law to the state law claims throughout this Memorandum and Order.

Act (KTCA) include:  (1) battery/assault (Count VII), (2) Negligent Supervision of Employees (Count VIII), (3) Negligent Supervision of Children (Count IX), and (4) False Imprisonment (Count X).

The court addresses each of USD 353's arguments for dismissal of these claims, below. The court begins by considering the school district's arguments for dismissing plaintiffs' § 1983 claim against the school district.

### 1.  § 1983 Claim Against USD 353 for Failure to Train (Count I)

Plaintiffs sue defendant USD 353 under 42 U.S.C. § 1983.  That statute makes a defendant liable if, under color of state law, the defendant deprives a person of a constitutional right.  42 U.S.C. § 1983.  The Third Amended Complaint alleges that the school district's failure to train its para-educators—defendants Moore and Creamer—amounts to deliberate indifference to Reed Saunders's constitutional rights to be free from bodily harm.  Doc. 90 at 21 (Third Am. Compl. ¶ 103).  USD 353 asks the court to dismiss this claim for failing to allege enough facts to meet the minima of proper pleading.  The court briefly recites the elements of a failure-to-train claim before addressing defendant USD 353's arguments that plaintiffs here fail to state that claim.

### a.  Failure to Train Claims

A "local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  The "'government as an entity' may only be held liable 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'"  *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019) (quoting *Monell*, 436 U.S. at 694).  To establish municipal liability, a

plaintiff must first demonstrate a "municipal policy or custom[.]"  *Id.*  That "municipal policy or custom" can be "the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused."  *Id.* (quoting *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010)).  "After establishing a municipal policy or custom, a plaintiff must demonstrate a direct causal link between the policy or custom and the injury alleged."  *Id.* at 1284 (citation and internal quotation marks omitted).  "'Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.'"  *Id.* (quoting *Bd. Of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997)).  "The causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring."  *Id.* (citation and internal quotation marks omitted).

"Finally, at least for claims of inadequate hiring, training, or other supervisory practices, a plaintiff must demonstrate that the municipal action was taken with deliberate indifference as to its known or obvious consequences."  *Id.* (citation and internal quotation marks omitted).  "'Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action[.]'"  *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  A "'less stringent standard of fault for a failure-to-train claim 'would result in *de facto respondeat superior* liability on municipalities[.]'"  *Id.* (quoting *Connick*, 563 U.S. at 62).  "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to

disregard the risk of harm." *Id.* (citation and internal quotation marks omitted). "In most instances, notice can be established by proving the existence of a pattern of tortious conduct." *Id.* (citation and internal quotation marks omitted). "Deliberate indifference may be found absent a pattern of unconstitutional behavior only in a narrow range of circumstances where a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction." *Id.* (citations and internal quotation marks omitted).

To establish liability on a failure-to-train theory, plaintiff must (1) show a failure to supervise or train employees; (2) establish "'a direct causal link between the policy or custom and the injury alleged[;]'" and (3) "'demonstrate that the . . . action was taken with "deliberate indifference" as to its known or obvious consequences.'" *Id.* at 1283–84 (first quoting *Bryson*, 627 F.3d at 788; then quoting *Brown*, 520 U.S. at 407).

Defendant USD 353 asserts that the Third Amended Complaint's attempt to plead these elements of a failure-to-train claim falls short of federal pleading standards for several reasons. *See* Doc. 93 at 5–17. Plaintiffs reject this reasoning. The court considers the parties' arguments about each of the alleged pleading deficiencies and determines whether any of them sink plaintiffs' failure-to-train claim at this stage of the litigation.

### b. Whether Plaintiffs Allege that USD 353 Failed to Train its Employees

*First*, USD 353 challenges whether plaintiffs plead their § 1983 claim's first element: defendant's failure to supervise or train employees. The school district contends that the Third Amended Complaint offers no more than bald assertions that employees Moore and Creamer did not receive proper training. Doc. 93 at 6. Defendant USD 353 reasons that plaintiffs' pleading thus fails to satisfy *Twombly* and *Iqbal*. *Id.* Plaintiffs push back. They assert that the Third Amended Complaint not only alleges that defendant USD 353 failed to train its employees, but

also adorns that allegation with details that make it more than conclusory.  Doc. 99 at 12–13.

The court agrees with plaintiffs on this point.

Plaintiffs' Response directs the court to specific allegations in their pleading that identify

(1) the persons not trained, (2) the person who failed to train them, (3) that person's history of

ineffective training, (4) the problems with the training the employees did receive, (5) the gaps in

that training, and (6) specific manifestations of USD 353's failure to train.  *See id.* (citing Doc.

90 at 6, 14–15 (Third Am. Compl. ¶¶ 28, 31 79, 80, 83)).  Given these allegations, the pleading's

assertion that defendant USD 353 failed to train its employees is more than a threadbare recital

of one element of the cause of action—it enjoys the support of more than mere conclusory

statements.  *See Bixler*, 596 F.3d at 756.  Simply, the Third Amended Complaint alleges facts

that, if true, are capable of supporting a reasonable finding or inference that plaintiffs satisfy the

failure-to-train element of their § 1983 claim.  The court thus declines to grant USD 353's

Motion to Dismiss the § 1983 claim against it under Count I on this ground.

### c.  Whether Plaintiffs Allege Deliberate Indifference

*Second,* the school district challenges the deliberate indifference element of plaintiffs'

claim.  "'Deliberate indifference is a stringent standard of fault'" requiring "'proof that a[n] actor

disregarded a known or obvious consequence of his action.'"  *Waller*, 932 F.3d at 1284 (quoting

*Connick*, 563 U.S. at 61).  A § 1983 plaintiff can satisfy this standard when the actor "'has actual

or constructive notice that its action or failure to act is substantially certain to result in a

constitutional violation, and it consciously or deliberately chooses to disregard the risk of

harm.'"  *Id.* (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1207 (10th Cir. 1998)).  "To satisfy

the stringent deliberate indifference standard, '[a] pattern of similar constitutional violations by

untrained employees is ordinarily necessary.'"  *Id.* at 1285 (quoting *Connick*, 563 U.S. at 62

(further internal quotations omitted)).  The exception to this ordinary requirement exists, but "[e]vidence of 'a pre-existing pattern of violations' is only unnecessary 'in a narrow range of circumstances,' 'however rare,' in which 'the unconstitutional consequences of a failure to train' are 'highly predictable' and 'patently obvious.'"  *Id.* (quoting *Connick*, 563 U.S. at 63–64 (further internal quotation marks omitted)).

The court first considers whether plaintiffs allege enough to support a reasonable finding or inference that the school district had the requisite notice for purpose of deliberate indifference.

### i.   Whether Plaintiffs Allege that USD 353 had Notice for Purposes of Deliberate Indifference

Defendant USD 353 argues that plaintiffs fail to allege enough facts about *notice* to support their assertion that the school district was deliberately indifferent to an omission in its training program.  Doc. 93 at 9–10.  The school district argues that plaintiffs' allegations—that district administrators were on notice that its employee was not adequately supervising or training para-educators—are only conclusory assertions devoid of factual context that the governing pleading standard requires.  *Id.* (first citing *Velasco v. Stancil*, No. 15-cv-02856, 2017 U.S. Dist. LEXIS 12331, at *12 (D. Colo. Jan. 9, 2017); then citing *Cary v. Hickenlooper*, 674 F. App'x 777, 780 (10th Cir. 2016)).  Plaintiffs defend their pleading by arguing that it alleges enough facts to support the assertion that the school district had both actual and constructive knowledge.  *See* Doc. 99 at 13–14, 18.

The court agrees with plaintiffs' reasoning and concludes that plaintiffs have alleged enough facts about notice to satisfy the pleading requirement.  Specifically, the Third Amended Complaint alleges that defendant USD 353 had received multiple reports and concerns over several years leading up to the 2019 gymnasium incident.  Doc. 90 at 6–7 (Third Am. Compl. ¶¶ 27–31, 37).  These allegations make this case different than the two cases that USD 353 cites to

14

support its argument that plaintiffs' notice allegations can't pass muster. *See* Doc. 93 at 9–10 (first discussing *Velasco v. Stancil*, No. 15-cv-02756-PAB-STV, 2017 U.S. Dist. LEXIS 12331, at *1 (D. Colo. Jan. 9, 2017); then discussing *Cary v. Hickenlooper*, 674 F. App'x. 777, 780 (10th Cir. 2016)).

The school district's own description of *Velasco* reveals the difference between the dearth of allegations in *Velasco* and the factual content alleged in the Third Amended Complaint. *See* Doc. 93 at 9. *Velasco* found a plaintiff had filed to plead facts supporting an inference defendants had knowledge where plaintiffs' pleading "fails to include any allegations regarding the nature of the alleged prior assault or how the officers allegedly became aware of it." *Velasco*, 2017 U.S. Dist. LEXIS 12331, at *12.

In contrast, the pleading here alleges both facts about the nature of the prior misconduct and how the defendants allegedly became aware of it. Plaintiffs' pleading alleges that the school district received these reports from multiple sources, including P.J. Saunders, USD 353 employees, and outside agencies. *Id.* at 6, 13–14 (Third Am. Compl. ¶¶ 27–31, 77–78). Plaintiffs allege that these reports complained about both (1) mistreatment of Reed Saunders and (2) defendant Gray training para-educators to bite or sit on children. *Id.* at 6–7 (Third Am. Compl. ¶¶ 27–31, 37). In particular, the pleading alleges that P.J. Saunders's complaints to the school district reported inhumane treatment of Reed Saunders, including defendant Gray's (1) use of pain to control the child and (2) pouring cold water on his genitalia. *Id.* at 6, 17–18 (Third Am. Compl. ¶¶ 27, 28, 90(a); 90(b); 90(c)). These allegations, and others like them in the Third Amended Complaint, put forth facts about the nature of prior misconduct and how USD 353 learned of it. *Velasco* differs.

For similar reasons, *Cary* fails to deflate plaintiffs' claim that USD 353 had the knowledge necessary to find "deliberate indifference." *Cary* held that the district court properly dismissed plaintiff's claim requiring knowledge because the Complaint contained "only conclusory and generalized allegations concerning the defendants' knowledge . . . and it insufficiently allege[d] their awareness of facts from which the inference could be drawn that they knew" the relevant information. *Cary*, 674 F. App'x at 780.  In contrast, the allegations here about various persons contacting defendant USD 353 and registering concerns with the school district about its employees' training and conduct, and the wellness of the child at issue in this case are not conclusory statements or generalized allegations of notice.[2]  Instead, these allegations offer facts from which a reasonable fact finder could infer that USD 353 knew of certain conduct, practices, and risks to vulnerable students in its district.  The court thus rejects defendant USD 353's argument that plaintiffs failed to allege facts about notice necessary to support a failure to train claim under § 1983.

Next, the court considers defendant USD 353's second reason for concluding that plaintiffs fail to state a deliberate indifference claim under § 1983:  the absence of a pattern of unconstitutional conduct.

### ii.  Whether Plaintiffs Allege a Pattern of Unconstitutional Conduct

Defendant USD 353 asserts that plaintiffs have failed to allege a qualifying pattern of unconstitutional conduct.  *See* Doc. 93 at 12–15.  The school district wages this campaign on

---

[2]      This is not to say that the Third Amended Complaint contains no conclusory statements or generalized allegations.  It surely does.  And as *Cary* notes, in cases where a Complaint's conclusory statements arrive at the courthouse unaccompanied by factual context, the Federal Rules of Civil Procedure would not obligate the court to credit those statements when it decided a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  *See Cary*, 674 F. App'x at 780 (quoting *Iqbal*, 556 U.S. at 686).  But plaintiffs' pleading here includes plenty of factual allegations that are specific and far more than mere conclusory statements that a given element of their cause of action is met.

several fronts.  It asserts that (1) plaintiffs allege misconduct in vague and conclusory terms, and (2) what plaintiffs do allege fails to form a pattern because the events are either too remote, too dissimilar, or insufficiently severe to shock the conscience.  *See* Doc. 93 at 12–17.  Below, the court considers but rejects each of these sub-arguments.

USD 353 deems the Third Amended Complaint insufficient because the pleading purportedly alleges misconduct in vague and conclusory terms.  Doc. 93 at 11–16.  The school district asserts that the lack of detail prevents the school district from reasonably determining the specific allegations against it.  *See* Doc. 93 at 13–15.  These arguments fall flat.  The school district misunderstands the Federal Rules of Civil Procedure governing plaintiffs' burden at this stage of the litigation.  That misunderstanding appears to have infected much of USD 353's arguments for dismissal.  The school district asks the court to subject plaintiffs to pleading requirements well above and well beyond what the law actually demands.

Rule 8(a)(2) provides that a Complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  The Supreme Court has emphasized that detailed factual allegations are not necessary.  *See Iqbal*, 556 U.S. at 678–79.  And the Tenth Circuit recently has offered similar guidance about what qualifies as a sufficiently detailed pleading.  *See, e.g.*, *Richeson v. United States*, ___ F. App'x ___, No. 20-1429, 2021 WL 868485, at *2 (10th Cir. Mar. 9, 2021) (explaining that plaintiff "does not need to provide exact details to state a claim for relief under Rule 8.  He needs only to provide allegations which are clear enough so that the opposing party and the court can discern a factual and legal basis for his claims").

Here, the Third Amended Complaint alleges more than mere conclusory statements that the various requirements of plaintiffs' § 1983 claim are met.  Instead, the pleading alleges facts

to support reasonable findings or inferences that plaintiffs meet those elements of the cause of action.  At this stage of the litigation, those facts are assumed true.  *Iqbal*, 556 U.S. at 678–79.  The Third Amended Complaint alleges detail about the treatment of Reed Saunders and training at USD 353 that is not complete, but nonetheless is plentiful enough to qualify as a "short and plain statement of the claim" required to satisfy Fed. R. Civ. P. 8.  The school district's suggestion that it cannot reasonably determine the allegations against it is a reach and divorced from both the plaintiffs' pleading and the standards governing it.

Defendant USD 353 asserts that even if plaintiffs' allegations are sufficient to meet the pleading standards, they fail to support certain elements of plaintiffs' cause of action.  *See* Doc. 93 at 13–14.  USD 353 asserts that the Third Amended Complaint's allegation of genital dousing alleges an event too dissimilar and too remote in time to support a claim of deliberate indifference against the school district.  Doc. 93 at 13–14.  This argument is unconvincing for several reasons.

*First*, the court declines to read the Third Amended Complaint as alleging a single incident.  The pleading alleges multiple incidents.  *See, e.g.*, Doc. 90 at 15–16 (Third Am. Compl. ¶ 85) (alleging that plaintiff had asked the school district repeatedly to end "inhumane treatment of Reed, including . . . pouring cold water on his erections").  *Second*, the various incidents over time show a pattern of similar acts.  While pouring cold water on a student's erections is not identical to sitting on, biting, or dragging a child, all the acts are physical mistreatment of a disabled student in the school district's care.  Each is an act of force to control the disabled child's behavior or body.  They are not so dissimilar in form or objections.  *Third*, the pleading alleges many reports of concerns about bizarre tactics and mistreatment of disabled children between 2015 and 2019.  *See* Doc. 90 at 6–7, 13–14 (Third Am. Compl. ¶¶ 27–30, 37,

77).  Concerns voiced to the school district in 2015, 2017, and 2018 focused on Reed Saunders's

safety at the hands of his teachers and caretakers at school.  *Id.*  Construing these allegations in

plaintiffs' favor, the court declines USD 353's invitation to deem these acts too dissimilar or too

distant to support plaintiffs' claim of deliberate indifference.

### iii.  Whether Plaintiffs Allege Conduct that is Conscience Shocking

USD 353 also argues that the alleged conduct falls short of conscience shocking.  Doc. 93

at 16–17.  "To satisfy the 'shock the conscience' standard, the plaintiff must demonstrate 'a

degree of outrageousness and a magnitude of potential or actual harm that is truly conscience

shocking.'"  *Holloman v. Unified Sch. Dist. 259*, No. 05-1180-JTM, 2006 WL 1675932, at *6

(D. Kan. June 15, 2006) (quoting *Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir. 1995)).

The school district seeks to distinguish the conduct here from other cases our Circuit has

decided.  *See* Doc. 93 at 17.  But USD 353's comparisons undervalue Reed Saunders's

condition.  The mistreatment alleged here is disturbing.  But a fact finder reasonably could

conclude from the facts alleged that Reed Saunders's superlative vulnerability turns up the dial

of outrage.[3]  The Third Amended Complaint alleges that Reed Saunders is a blind boy with

cerebral palsy who is non-verbal, weighs about 75 pounds, gets around only with the assistance

of others plus his wheelchair or walker, and had the cognitive function of a one to three year old.

*See* Doc. 90 at 2–3, 8 (Third Am. Compl. ¶¶ 4–7, 14, 40).

---

[3]      At least one other court in our Circuit has considered a disabled child's vulnerability when
considering similar questions whether a teacher's treatment of that student was "conscience shocking."
*See Gerks v. Deathe*, 832 F. Supp. 1450, 1454 (W.D. Okla. 1993) (considering the mental disability of a
child with cerebral palsy with the mental age of a four year old and an inability to understand the special
education teacher's actions and concluding that a rational jury could find that those actions were so
demeaning and harmful to the child that they might have violated her substantive due process rights); *see
also Harris v. Robinson*, 273 F.3d 927, 930–31 (10th Cir. 2001) (discussing *Gerks*).

The Third Amended Complaint alleges that P.J. Saunders had contacted the school district three times to report her concern that its employees were dragging Reed Saunders, *id.* at 13–14, 18–19 (Third Am. Compl. ¶¶ 77, 90(f), 91(c)), and that the conduct could damage the boy's delicate, surgically repaired spine, *id.* at 7–8 (Third Am. Compl. ¶¶ 37, 39). The Third Amended Complaint suggests that the magnitude of potential physical harm here—damaging the boy's "compromised spine,"—was significant. *Id.* at 2 (Third Am. Compl. ¶ 4). The allegations about Reed Saunders's physical and mental condition imply that the child's fragility and vulnerability was obvious. *See Id.* at 2–3, 8 (Third Am. Compl. ¶¶ 4–7, 14, 40). Construing the allegations in the light most favorable to plaintiffs, the court rejects defendant USD 353's argument that the alleged dragging of Reed Saunders is not conscience shocking. But even if the dragging merely was careless, the allegations about intentionally inflicting pain on the boy via "martial arts style pressure points" and pouring cold water on his erections describes conduct that a fact finder could conclude is both outrageous and, potentially, harmful enough to shock the conscience. *Id.* at 6 (Third. Am. Compl. ¶¶ 27–30). When inflicted upon a child so supremely vulnerable, the alleged conduct is sufficiently disproportionate, outrageous, and potentially harmful to be conscience shocking.

Given the presence of a pattern of alleged unconstitutional behavior here, the court need not confront whether the mistreatment of Reed Saunders was a highly predictable or plainly obvious consequence of the school district's inaction capable of supporting a finding of deliberate indifference even if a pattern of unconstitutional behavior was absent. But the court notes that the school district had reason to know of conduct that, even if not unconstitutional itself, warned of risk to special needs students. The school district received complaints that school officials were trained to bite and sit on children including Reed Saunders. *Id.* at 6, 13

(Third Am. Compl. ¶¶ 31, 76).  Those warnings forecasted a violation of federal rights due to physical mistreatment of students would follow inaction by the school district.  The forecast carries a higher degree of confidence when considered along with the reports of unconstitutional misconduct described above.  Plaintiffs allege facts supporting the finding or inference that alarm bells were ringing within the school district about its employees not only mistreating vulnerable disabled children, but also receiving guidance from superiors to bite and sit on them.

Plaintiffs allege that the school district received reports of both (1) various acts that describe a pattern of unconstitutional physical mistreatment of vulnerable students, and (2) other conduct forecasting future violations of federal rights.  These acts are similar.  They all involve physical mistreatment of disabled children within the school district.  The pleading alleges facts capable of supporting a reasonable finding or inference that decisionmakers within the school district had notice that a course of training was deficient in a particular respect and deliberately chose a training program that would cause violations of constitutional rights.  *See Waller*, 932 F.3d at 1285.  Given these allegations, the court rejects defendant USD 353's argument that plaintiffs fail to allege facts capable of supporting a finding or reasonable inference of deliberate indifference.

### 2.  Rehabilitation Act Claim Against USD 353 (Count VI)

Defendant USD 353 asserts that plaintiffs fail to state a claim under the Rehabilitation Act of 1973.  *See* Doc. 93 at 18.  "Section 504 of the Rehabilitation Act states:  'No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .'"  *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1151 (10th Cir. 1999) (quoting 29 U.S.C. § 794(a)).  "A prima

facie case under § 504 consists of proof that (1) plaintiff is handicapped under the Act; (2) he is 'otherwise qualified' to participate in the program; (3) the program receives federal financial assistance; and (4) the program discriminates against plaintiff." *Hollonbeck v. U.S. Olympic Comm.*, 513 F.3d 1191, 1194 (10th Cir. 2008) (quoting *Powers*, 184 F.3d at 1151).

"Courts have recognized three ways to establish a discrimination claim:  (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1295 (10th Cir. 2016).  Given that these three avenues can allege a plausible discrimination claim, "intentional discrimination is not an element of the plaintiff's prima facie case[,]" but a plaintiff must "prove intentional discrimination to receive an award of compensatory damages."  *Powers*, 184 F.3d at 1152.

The school district argues that plaintiffs fail to allege facts capable of supporting a finding or inference of disparate treatment.  *See* Doc. 93 at 19.  It argues that plaintiffs must allege facts suggesting that nondisabled but otherwise similarly situated persons received more favorable treatment than plaintiff Reed Saunders.  Doc. 93 at 19–20 (citing *Hwang v. Kan. State Univ.*, 753 F.3d 1159, 1164 (10th Cir. 2014)).  Plaintiffs protest, asserting that they are subject to no such requirement.  Plaintiffs argue that their pleading need not discuss similarly situated persons because they allege facts that, if true, would provide not only circumstantial evidence of disability discrimination, but direct evidence of it, too.

In *Hwang*, then-Judge Gorsuch explained that "to raise the specter of discrimination through disparate treatment a plaintiff must allege facts suggesting non-disabled—but otherwise similarly situated—employees receive more favorable treatment."  *Hwang*, 753 F.3d at 1164. *Hwang* clarified that while "plaintiffs don't have to incant any particular litany of facts to

support a claim of differential treatment, they *do* have to allege some set of facts that taken together plausibly suggest differential treatment of similarly situated employees." *Id.*

Plaintiffs achieve that here.  They allege that Reed Saunders was subject to school district employees pouring cold water on his erections.  *See* Doc. 90 at 15–17 (Third Am. Compl. ¶¶ 85, 87(a), 90(a)).  Plaintiffs also allege that Reed Saunders "did nothing to warrant or provoke any physical restraint or beating by Creamer[.]"  *Id.* at 9 (Third Am. Compl. ¶ 48).  Plaintiffs allege that other non-disabled students of USD 353 did not receive the same physical force and punishment that Reed Saunders did.  *See id.* at 25 (Third. Am. Compl. ¶¶ 130–132).  The court need not go out on a limb when a bit of common sense permits it to infer from plaintiffs' allegations that some non-disabled students also experienced erections and did not deserve to be struck, bitten, or battered by school district employees.  *See Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its . . . common sense.").

The Third Amended Complaint alleges facts that suggest non-disabled but otherwise similarly situated students received more favorable treatment than Reed Saunders.  *See* Doc. 90 at 25 (Third. Am. Compl. ¶¶ 130–132).  The court rejects defendant USD 353's argument that plaintiffs fail to allege disparate treatment sufficiently.  Because plaintiffs adequately allege intentional discrimination via disparate treatment, the court need not consider whether they have failed to allege intentional discrimination in other ways.

The court now turns to USD 353's arguments for dismissing plaintiffs' Kansas law claims against it.

### 3. Whether the Court Should Decline to Exercise Supplemental Jurisdiction Over the State Law Claims

Defendant USD 353 moves the court to dismiss the federal claims and then decline to exercise supplemental jurisdiction over the remaining state law claims under 28 U.S.C. § 1367(c). Doc. 93 at 26. Because the court denies the school district's Motion to Dismiss the *federal* claims, this case has not become a purely state law dispute. The court will continue to exercise supplemental jurisdiction over the state law claims. The court thus will consider the school district's alternative dismissal arguments applying to just two of the four state law claims. The court begins with plaintiffs' claim for negligent supervision of employees (Count VIII), and then it addresses the negligent supervision of children claim (Count IX).

### 4. Negligent Supervision of Employees Claim (Count VIII)

Plaintiffs bring a claim against the defendant USD 353 under Count VIII for negligent supervision of employees. In support of its motion to dismiss this claim, the school district asserts that negligent supervision of employees is not a valid cause of action under Kansas law. Doc. 93 at 27. The school district also argues that even if this claim were available, plaintiffs here fail to state that claim. *Id.* at 28. Plaintiffs disagree.

The parties squabble over the meaning of the Kansas Supreme Court's decision in *Reardon for Est. of Parsons v. King*, 452 P.3d 849, 855 (Kan. 2019). *See* Doc. 93 at 27–28; Doc. 99 at 26–27; Doc. 103 at 14–16. Defendant USD 353 reiterates that negligent supervision is not itself a cause of action under Kansas law. Doc. 103 at 14–15. The school district asserts that *Reardon* shows that a failure to supervise is a species of breach that a plaintiff might allege to support a claim against an employer/defendant whose employee has harmed a third party. *See* Doc. 93 at 27–28. Plaintiffs don't dispute this. *See* Doc. 99 at 26–27. They merely object to the

notion that this clarification of the boundaries demarcating duty from breach justifies dismissal of their claim for negligent supervision of employees.

USD 353's arguments about *Reardon* are a bit too confident.  *Reardon* rejected the splitting of negligence into various distinct causes of action via particularized articulations of the general duty of reasonable care.  *Reardon*, 452 P.3d at 855–56.  Contrary to the school district's assertion, Doc. 103 at 16, *Reardon* does not preclude a plaintiff from bringing multiple theories of breach under the same cause of action.  Moreover, as explained in the analysis below of plaintiffs' claim based on negligent supervision of children, plaintiffs are not doing that.

Plaintiffs' Third Amended Complaint may have muddled the lines between duty and breach, but that doesn't mean plaintiffs cannot assert a negligence claim *based on* shoddy supervision of school district employees.  Kansas law makes "clear that an employer owes a duty of reasonable care under the circumstances to prevent harm to third parties caused by its employees when those employees are acting within the scope of their employment."  *Reardon*, 452 P.3d at 855 (citations omitted).  So, plaintiffs can bring a negligence claim based on the school district's beach of its duty to Reed Saunders by failing to supervise its employees.

Plaintiffs do that here, albeit clumsily.  They misstate the relevant duty that Kansas law places on employers.  The Third Amended Complaint alleges that "Defendants District and Gray owed Plaintiff Reed Saunders a duty to control and supervise Defendants Gray, Moore, and Creamer."  Doc. 90 at 30 (Third Am. Compl. ¶ 169).  This assertion fails to articulate properly the legal duty that the school district owed Reed Saunders.  Plaintiffs point out that the parties previously exchanged arguments about this very issue.  *See* Doc. 99 at 26.  Given that this is the second lap around the track about this question, plaintiffs' failure to state the legal duty properly

is perplexing.  In any case, *Reardon* does not preclude plaintiffs from bringing the claim they label "Negligent Supervision of Employees[.]"  Doc. 90 at 30.

Defendant USD 353 argues that the court should dismiss the claim anyway.  It asserts that plaintiffs fail to allege facts to support their allegation that the school district knew or should have known that defendants Gray, Moore, and Creamer presented a clear and specific danger to plaintiff Reed Saunders.  Doc. 93 at 28.  The school district explains that analysis of this issue is similar to the analysis of plaintiffs' allegations of deliberate indifference for the § 1983 claim under Count I.  *Id.*  The court agrees.  And for the same reasons that the school district's arguments were unpersuasive on that claim, they remain less than convincing here.  The Third Amended Complaint alleges facts capable of supporting a reasonable finding or inference that the school district knew or had reason to know of the risks of harm that its employees posed to Reed Saunders.  The court rejects USD 353's argument that plaintiffs' claim based on negligent supervision of school district employees fails to state a claim.  The court thus denies the school district's Motion to Dismiss this claim against USD 353 under Count VIII.

The court next considers the school district's arguments for dismissing the claim for negligent supervision of children under Count IX.

### 5.  Negligent Supervision of Children Claim (Count IX)

Defendant USD 353 invokes *Reardon* again to attack plaintiffs' claim for negligent supervision of children.  *See* Doc. 103 at 16 ("Because plaintiffs' claim for negligent supervision of children constitutes the type of 'particularized articulation' of the general duty of care which was disapproved in *Reardon*, plaintiffs have failed to state a valid cause of action under Kansas law.").  Plaintiffs argue that *Reardon* doesn't apply here.  *See* Doc. 99 at 29.

The court agrees with plaintiffs. *Reardon* held that the "jury instructions did not adequately or accurately explain the elements of [plaintiff's] negligence claim[,]" and that this "prevented the jury from ever being able to consider whether [plaintiff] had sufficiently proven each of the elements of the claim." *Reardon*, 452 P.3d at 854. The jury instructions explained that an "employer has a duty to supervise an employee it knows, or has reason to know, is unfit to undertake the responsibilities of his or her employment." *Id.* at 853. *Reardon* concluded the instruction was erroneous because Kansas case law "makes it clear that an employer owes a duty of reasonable care under the circumstances to prevent harm to third parties caused by its employees when those employees are acting in the scope of their employment." *Reardon*, 452 P.3d at 855. The Kansas Supreme Court reasoned that the jury instruction improperly narrowed the scope of the duty element more than the case law allows. *Id.* at 855–57. Such narrowing blurred the lines between duty and breach. *Id.* at 855.

But here, no improper narrowing is afoot. That's because the duty involved in plaintiffs' claim for negligent supervision of children differs from the duty at issue in *Reardon*. The opinion notes that Kansas case law reveals the duty's scope. *Id.* Significantly, both parties here note that Kansas case law describes the duty at issue here as something more precise than a duty of reasonable care. *See* Doc. 93 at 30 ("The Kansas Court of Appeals has held that a school district owes a duty to properly supervise students and to take reasonable steps to protect students' safety." (citation and internal quotation marks omitted)); Doc. 99 at 28–29. USD 353 points out that *Reardon* marked an effort to clarify confusion, specifically, about whether an employer's duty to third parties encompasses a duty to supervise or train employees. Doc. 103 at 15 (citing *Reardon*, 452 P.3d at 857). And the school district further notes that *Reardon* cited a non-employer case. *See id.* at 16 (quoting *Marshall v. Burger King Corp.*, 856 N.E.2d 1048,

1050 (Ill. 2006)).  But the court declines the school district's invitation to read *Reardon*'s
clarification as extending to supervision of children.  Doc. 103 at 16.  The court sees two reasons
why that reading is too broad.

*First*, *Reardon* reaches no explicit holding about duties owed to children in one's care.
The court acknowledges that *Reardon* cites *Marshall,* but the court remains unwilling to hang so
much on a peg so flimsy.  *Second*, the court does not read *Reardon*'s clarification to reach as far
as USD 353 proposes.  *See* Doc. 103 at 15 (quoting *Reardon*, 452 P.3d at 857).  One cannot read
Kansas case law fairly and conclude that it describes the duty a school owes to children under its
supervision as mere loose language that mentions "negligent supervision."  A review of those
cases instead reveals that Kansas courts have engaged in deep analysis of the question whether
this separate duty exists.  *See Dunn v. Unified Sch. Dist. No. 367*, 40 P.3d 315, 326–27 (Kan. Ct.
App. 2002) (surveying case law and rejecting the notion that schools only owe a duty of ordinary
or reasonable care to their adult students and adopting instead the rule that "the duty owed by a
school district to its high school students is . . . to properly supervise students and to take
reasonable steps to protect students' safety" (internal quotation marks omitted)).  The court does
not read *Reardon*'s effort to clarify earlier loose language, *see* 452 P.3d at 857, as overturning
cases like *Dunn* that feature explicit holdings based on substantially different facts.

After looking to Kansas case law cited in the parties' briefs to determine the scope of the
duty USD 353 owed to Reed Saunders as a child under its supervision, the court concludes that
the duty alleged here is not merely a "particularized articulation" of the general duty of care, but
rather a different duty altogether.  The school district's argument—that plaintiffs bring a merely
duplicative claim for run-of-the-mill negligence—thus fails to persuade the court.  And the Third
Amended Complaint alleges facts capable of supporting a finding or inference that USD 353

owed a duty to Reed Saunders as a child under its supervision, and that the school district's breach of that duty caused him harm.  The court thus denies USD 353's Motion to Dismiss this claim for negligent supervision of children under Count IX.

This conclusion completes the court's analysis of issues presented by defendant USD 353's Motion to Dismiss.  The court denies that Motion to Dismiss (Doc. 92).  The court now turns to the second Motion to Dismiss (Doc. 96) and the arguments that defendants Moore and Gray offer to support their motion.

## III.    Defendants Moore and Gray's Motion to Dismiss (Doc. 96)

Plaintiffs bring several federal and state law claims against USD 353 employees Tammy Moore and Brenda Gray.  The claims against each are not identical.

Against defendant Moore, plaintiffs bring:

- Federal claims under § 1983 for violating Reed Saunders's rights to substantive due process under the Fourth and Fourteenth Amendments (Count II), danger creation (Count III), violating Reed Saunders's right to equal protection under the Fourteenth Amendment (Count IV), and

- Kansas law claims for battery/assault (Count VII), negligent supervision of children (Count IX), false imprisonment (Count X), battery (Count XI), outage/intentional infliction of emotion distress (Count XII), and false imprisonment against Moore in her individual capacity (Count XIII).

Against defendant Gray, plaintiffs bring:

- Federal claims under § 1983 for failure to train (Count I), danger creation (Count III), and supervisory liability (Count V), and

- Kansas law claims for negligent supervision of employees (Count VIII), negligent supervision of children (Count IX), false imprisonment (Count X), battery (Count XI), outage/intentional infliction of emotion distress (Count XII), and false imprisonment against Gray in her individual capacity (Count XIII).

The court first considers defendants' argument for dismissing the federal claims, and then turns to the arguments for state law claims. As the court will explain in full below, the court grants the Motion to Dismiss (Doc. 96) in part and denies it in part. The court's analysis begins with the federal claim under § 1983 that plaintiffs bring against defendant Gray in Count I.

### A.   Whether Plaintiffs State a Failure to Train Claim Against Defendant Gray Under § 1983 (Count I)

In Count I, plaintiffs bring a supervisory liability claim against defendant Gray. Doc. 90 at 20. Defendant Gray moves to dismiss this claim for two reasons. Doc. 97 at 17. *First*, she asserts that this failure to train claim is based on *Monell* and thus does not apply to her as a schoolteacher who lacks final policymaking authority. *Second*, defendant Gray asserts that this claim, if not an inapplicable *Monell* claim, is duplicative because it is effectively the same claim for supervisory liability that plaintiffs bring against her under Count V. Defendants cite no case law or civil procedure rule to support their argument about how the court ought to resolve duplicate claims at the motion to dismiss stage of litigation.

Plaintiffs' Response neglects to address these arguments directly. *See* Doc. 100 at 25–27. Plaintiffs argue that they have plausibly stated a failure to train claim under § 1983. *Id.* at 25. In doing so, they reject the proposition that liability for failure to train depends on final policymaking authority. *Id.* at 26. Also, plaintiffs do not explain why this claim under Count I is not duplicative given the claim they raise under Count V. In fact, plaintiffs explain that a "failure to adequately train an employee should not be regarded as a theory of liability but should

instead be viewed as a theory of causation." *Id.* at 25 (citing *Dodds v. Richardson*, 614 F.3d 1185, 1209 (10th Cir. 2010)).  Plaintiffs' characterization of the relationship between alleged failure to train and supervisory liability actually supports defendant Gray's argument that little distinguishes the failure to train claim under Count I and the supervisory liability claim under Count V based on, at least in part, defendant Gray's failure to train her subordinates.  *See* Doc. 100 at 20–22 (arguing that plaintiffs have plausibly pleaded supervisory liability under Count V against defendant Gray).

But plaintiffs' omissions aside, defendants fail to show why that matters at this time. Plaintiffs are the master of their Complaint.  And the Federal Rules explicitly permit litigants to plead alternative theories of recovery.  *See* Fed. R. Civ. P. 8(a)(3) (authorizing a party to plead "relief in the alternative or different types of relief").  The Rules also contemplate inconsistent and even hypothetical statements of a party's claim or defense.  *See* Fed. R. Civ. P. 8(d)(2) (allowing a party to "set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones.  If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."); *see also* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency.  If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.").[4]

---

[4]      Our court has treated potentially duplicative claims consistent with the spirit of Rule 8—and opted not to dismiss them early in the litigation.  *See, e.g.*, *Charbonneau v. Mortg. Lenders of Am., LLC*, No. 18-2062-CM-KGS, 2018 WL 6411447, at *2 (D. Kan. Dec. 6, 2018) (declining to dismiss unjust enrichment claim as "duplicative" of an FMLA claim because plaintiff has pleaded the claim "as an alternative theory," and, the court found, "it would be premature to dismiss [it] as duplicative"); *Shields v. U.S. Bank Nat'l Ass'n ND*, No. 05-2073-CM, 2005 WL 3335099, at *1–2 (D. Kan. Dec. 7, 2005) (refusing to dismiss negligence claim as "duplicative" of breach of contract claims because even though "the court will not permit plaintiff to make a double recovery, alternative pleading of his negligence and contract claims [was] appropriate at this point"); *VNA Plus, Inc. v. Apria Healthcare Grp., Inc.*, 29 F.

The court declines to dismiss Count I against defendant Gray on "duplicative" grounds. But the court will return to this claim during its forthcoming discussion of whether the doctrine of qualified immunity. The court now turns to the other claims that plaintiffs bring against defendants Moore and Gray, and the defense of qualified immunity that these defendants invoke in return. The court begins by reciting the legal standard governing the doctrine qualified immunity.

**B.    Whether Qualified Immunity Bars Certain Claims Against Defendants Moore and Gray**

**1.  Legal Standard**

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004)).

To establish a claim under 42 U.S.C. § 1983 against an individual defendant who asserts the defense of qualified immunity, plaintiff must (1) come forward with facts that "make out a

---

Supp. 2d 1253, 1267 (D. Kan. 1998) (permitting plaintiff "to plead alternative theories of recovery" for negligence and breach of contract even though "[p]laintiff may be precluded, however, from recovering under both theories, or even having both theories submitted to the jury").   !

violation of a constitutional right[,]" and (2) demonstrate that "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* at 232 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "In conducting [a] qualified immunity analysis, . . . courts must consider . . . whether *each* defendant's alleged conduct violated the plaintiff's clearly established rights." *Matthews v. Bergdorf*, 889 F.3d 1136, 1144 (10th Cir. 2018) (citation and internal quotation marks omitted).

A court has discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. Addressing the "clearly established" question first "may avoid the risk of deciding a case incorrectly given insufficient briefing on the constitutional violation question." *Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir. 2010) (citing *Pearson*, 555 U.S. at 239).

A right is clearly established when "'there [is] a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts . . . found the law to be as the plaintiff maintains.'" *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011) (quoting *Stearns v. Clarkson*, 615 F.3d 1278, 1282 (10th Cir. 2010)). But the "plaintiff cannot simply identify a clearly established right in the abstract and allege that the defendant has violated it." *Herring v. Keenan*, 218 F.3d 1171, 1176 (10th Cir. 2000) (citation and internal quotation marks omitted). Instead, the court must determine "'whether the violative nature of *particular* conduct is clearly established.'" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

Conversely, to hold a defendant liable under § 1983, it is not necessary that "'the very action in question has previously been held unlawful.'" *Id.* at 1866–67 (quoting *Anderson v.*

*Creighton*, 483 U.S. 635, 640 (1987)). Thus, for qualified immunity to apply, the Supreme Court does not require a "reported case directly on point." *Id.* at 1867 (citation and internal quotation marks omitted). Instead, the Supreme Court's case law requires district courts to evaluate whether "the unlawfulness of the officer's conduct '[is] apparent'" "'in the light of pre-existing law.'" *Id.* (quoting *Anderson*, 483 U.S. at 640). This governing standard "'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'" *Lane v. Franks*, 573 U.S. 228, 243 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). In short, the doctrine of qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ziglar*, 137 S. Ct. at 1867 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

### 2. Qualified Immunity Analysis

To establish their § 1983 claims against defendants Moore and Gray—who both invoke the defense of qualified immunity—plaintiffs must (1) come forward with facts that "make out a violation of a constitutional right," and (2) demonstrate that "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (citing *Saucier*, 533 U.S. at 201). A court has discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

Here, the court elects to proceed first to the second prong. The court considers whether any of the constitutional rights at issue were clearly established when defendants Moore and Gray's alleged misconduct occurred. "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix*, 577 U.S. at 11 (citations and internal quotation marks omitted). The Supreme Court

34

has instructed courts not to define the right at issue "'at a high level of generality.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Ashcroft*, 563 U.S. at 742).  Instead, "the clearly established law must be 'particularized' to the facts of the case." *Id.* (quoting *Anderson*, 483 U.S. at 640); *see also Mullenix*, 577 U.S. at 12 ("This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." (citation and internal quotation marks omitted)).

This standard does not "'require a case directly on point' for a right to be clearly established[.]" *White*, 137 S. Ct. at 551 (quoting *Mullenix*, 577 U.S. at 12).  Instead, to find that a statutory or constitutional right was "clearly established," some "'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Mullenix*, 577 U.S. at 12).  The precedent clearly establishing a constitutional right must come from "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Reavis ex rel. Coale v. Frost*, 967 F.3d 978, 992 (10th Cir. 2020) (citation and internal quotation marks omitted).  "But even when such a precedent exists, subsequent [controlling] cases may conflict with or clarify the earlier precedent, rendering the law unclear." *Crowson v. Washington Cnty. Utah*, 983 F.3d 1166, 1182 (10th Cir. 2020) (citation and internal quotation marks omitted).  "When the question is within the realm of reasonable debate, the law is not clearly established." *Id.* (citation and internal quotation marks omitted).  "For law to be clearly established, [t]he precedent must be *clear enough* that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.* (citation and internal quotation marks omitted).

In Count II, plaintiffs assert that defendant Moore violated Reed Saunders's substantive due process rights under the Fourth and Fourteenth Amendments.  Doc. 90 at 22.  The court now

considers those rights in turn, and decides whether the right at issue was clearly established in January 2019 when defendant Moore's alleged misconduct occurred.

### a. Whether the Substantive Due Process Rights at Issue (Count II) were Clearly Established

#### i. Whether the Substantive Due Process Right under the Fourth Amendment at Issue was Clearly Established

Plaintiffs assert that two Tenth Circuit decisions "effectively placed Moore on notice" of Reed Saunders's rights under the Fourth Amendment to be free from a school district employee using her hands to press and pin down his arms (which he uses for limited sign language) numerous times, transferring him from his wheelchair to his walker, and dragging him by his walker to the bathroom. Doc. 100 at 23 (citing *Ebonie S. v. Pueblo Sch. Dist. 60*, 695 F.3d 1051 (10th Cir. 2012) (quoting *Couture v. Bd. of Educ. of Albuquerque Pub. Schs.*, 535 F.3d 1243 (10th Cir. 2008))). But neither *Couture* nor *Ebonie S.* yields what plaintiffs seek. These cases have two limitations that render them of little help to plaintiffs here.

*First*, neither case held that the defendant's conduct constituted a "seizure" for purposes of the Fourth Amendment. *Couture* said little about what constitutes a Fourth Amendment seizure. In that case, our Circuit simply assumed that defendants' conduct qualified as a seizure so the appellate court could proceed to consider whether that conduct was unreasonable. *Couture*, 535 F.3d at 1251. And *Ebonie S.* explicitly held that the conduct at issue fell short of a Fourth Amendment seizure. *See Ebonie S.*, 695 F.3d at 1057. The Court of Appeals enumerated several factors precluding it from deeming the conduct a "seizure." *Id.* The Tenth Circuit noted that if "one or more of these facts were absent," the court's "conclusion *might* be different." *Id.* (emphasis added). Some of those factors indeed are absent from plaintiffs' allegations here. But *Ebonie S.* hypothesized merely a possibility of an alternative holding if factors it highlighted

36

were absent. *Ebonie S.*, 695 F.3d at 1057. The court discerns no "clearly established right" from a hesitant remark that hardly "placed the . . . constitutional question beyond debate." *White*, 137 S. Ct. at 551.

*Second*, neither case concluded that the conduct at issue was unreasonable. *Ebonie S.* didn't even reach the question. *See Ebonie S.*, 695 F.3d at 1057 (affirming district court's grant of summary judgment on Fourth Amendment claim because plaintiff "was not seized within the meaning of the Fourth Amendment"). And *Couture* held that defendants' conduct was not unreasonable, and thus could not violate the Fourth Amendment even if the conduct qualified as a "seizure." *Couture*, 535 F.3d at 1256. The court held "that the three individual defendants [were] entitled to qualified immunity on" the Fourth Amendment claim, reversing the district court's holding to the contrary. *Id.* Again, the allegations here differ from *Couture*'s facts in various respects, but those differences are not sufficient to support a conclusion under *Couture* that the conduct was unreasonable.

*Couture* and *Ebonie S.*, considered either individually or together, do not establish precedent "*clear enough* that every reasonable official would interpret it to establish the particular rule" that plaintiffs here seek to apply. *Crowson*, 983 F.3d at 1182 (citation and internal quotation marks omitted). Plaintiffs thus fail to satisfy the second prong of qualified immunity analysis for plaintiffs' substantive due process claim against defendant Moore under the Fourth Amendment. Qualified immunity applies and it bars plaintiffs from proceeding on this claim.

The court next considers the same question for plaintiffs' substantive due process claim under the Fourteenth Amendment.

### ii. Whether the Substantive Due Process Right under the Fourteenth Amendment at Issue was Clearly Established

Defendant Moore invokes the doctrine of qualified immunity against plaintiffs' substantive due process claim under the Fourteenth Amendment.  Doc. 97 at 13–14.  She argues that plaintiffs satisfy neither prong of the qualified immunity analysis.  The court elects to focus, first, on the "clearly established" issue.

Defendant Moore claims that her alleged conduct did not violate clearly established law.  *Id.* at 13.  Plaintiffs respond, pointing to several cases that purportedly "put Moore on notice that she could not use unwarranted, unprovoked physical force on a severely disabled student without violating his Constitutional rights."  Doc. 100 at 23.  Defendant Moore replies that plaintiffs' cases "are not factually similar to this case, and surely do not clearly establish that a school official's hands-on restraint and, at most one-hour long, seclusion in a bathroom at a school athletic event constitute excessive corporal punishment."  Doc. 105 at 7.  The court considers cases plaintiffs invoke to determine whether they established precedent "*clear enough* that every reasonable official would interpret it to establish the particular rule" that plaintiffs here seek to apply.  *Crowson*, 983 F.3d at 1182 (citation and internal quotation marks omitted).

Plaintiffs first cite *Garcia by Garcia v. Miera*, 817 F.2d 650, 652 (10th Cir. 1987).  In that case, the Tenth Circuit reviewed "a district court's grant of summary judgment" after the district court found "that school officials involved in two incidents of corporal punishment were insulated from liability under 42 U.S.C. § 1983 by qualified immunity."  *Id.  Garcia* first held that "at some point, excessive corporal punishment violates the pupil's substantive due process rights."  *Id.* at 653; *see also id.* at 655 ("[A]t some point of excessiveness or brutality, a public school child's substantive due process rights are violated by beatings administered by government-paid school officials.").

38

Next, *Garcia* held that "the law was clearly established before *Milonas* that some high level of force in a corporal punishment context would violate a child's substantive due process rights" and that "a reasonably competent legal advisor to a school district should have realized that egregious invasions of a student's personal security would be unconstitutional." *Id.* at 658.

Finally, the Tenth Circuit considered whether the alleged conduct met the "high" "threshold for recovery on the constitutional tort for excessive corporal punishment" at summary judgment. *Id.* *Garcia* analyzed the two alleged beatings separately. Our Circuit reasoned that "the allegations with respect to the first beating, that this nine-year-old girl was held up by her ankles and hit several times with a split board of substantial size on the front of her legs until they bled—supported by evidence of a permanent scar—are sufficient." *Id.* And *Garcia* then explained that the "allegations with respect to the second beating, that the punishment was severe enough to cause pain for three weeks—supported by pictures of the injured buttocks, an affidavit from an examining doctor that in his long experience he had not seen bruises like that from routine spankings, and an affidavit from an examining nurse that if a child had received this type of injury at home she would have reported it as child abuse—are also sufficient." *Id.*

The factual differences between *Garcia* and Reed Saunders's case are substantial. *Garcia* held that out-of-the-ordinary and physically injurious beatings with an object that leave a student bruised, bloodied, lacerated, and scarred constitute the "high level of force" when exacting corporal punishment or "egregious invasion[ ] of a student's personal security" that violate a child's substantive due process rights. *Id.* But given the canyon of difference between the paddling of the *Garcia* student and defendant Moore's conduct here, *Garcia* does not foreclose reasonable debate about the constitutionality of the latter. Because "the question is within the realm of reasonable debate, the law is not clearly established." *Crowson*, 983 F.3d at

39

1182 (citation and internal quotation marks omitted).  The court now turns to the other cases that

plaintiffs cite, and decides whether they provide the guidance necessary to alter that conclusion.

Plaintiffs next cite *Gerks v. Deathe*, 832 F. Supp. 1450, 1454 (W.D. Okla. 1993).  *See*

Doc. 100 at 23.  In a later case, the Tenth Circuit summarized the key facts of *Gerks* this way:

> In *Gerks,* a classroom teacher persuaded a mentally handicapped student with the
> mental abilities of a four-year-old and a documented fear of bathrooms to go to the
> bathroom before classes started.  The teacher subsequently learned that the student
> had left three piles of excrement on the bathroom floor.  The teacher tried to get the
> student to clean up her mess.  But, when the student did not make enough progress,
> the teacher told the student she would have to stay in the bathroom alone until the
> mess was cleaned up.  The teacher used a ribbon to fasten the bathroom door to
> prevent the student from leaving.  Only after the mess was mostly cleaned up did
> the teacher attempt to clean the student and give her clean clothes.  The school
> principal, aware of the teacher's actions, later showed the student a paddle "to let
> her know what happened when children did not obey school rules."  The principal
> wrote up a disciplinary report about the student's behavior.  The incident lasted
> almost three hours.

*Harris v. Robinson*, 273 F.3d 927, 930–31 (10th Cir. 2001) (citations omitted).

*Gerks* concluded that a rational jury could find that the teacher's "actions were so

demeaning and harmful to [the student] that they might have violated her substantive due process

rights."  *Gerks*, 832 F. Supp. at 1454.  The district court flagged three reasons.  *First*, the student

"had a documented fear of bathrooms, particularly of being left alone in the bathroom, that was

well known to" the teacher.  *Id.  Second*, evidence suggested that the student "might have been

left in the bathroom by herself for as long as two hours."  *Third*, the student "had been tested and

found to have an IQ of about 50, giving her the mental age of a four-year-old and affecting her

ability to understand [the teacher's] actions."  *Id.*  This reasoning comes from a district court

case, but our Circuit considered *Gerks* when it analyzed somewhat similar facts in *Harris v.

Robinson*, 273 F.3d 927, 928 (10th Cir. 2001), another case plaintiffs cite.  *See* Doc. 100 at 23.

In *Harris*, the Tenth Circuit reviewed the district court's grant of summary judgment for

defendants—a school teacher and the school district.  *Harris*, 273 F.3d at 928–29.  The court

considered whether "a ten-year-old mild to moderately retarded boy, was deprived of his constitutional rights when his home room teacher . . . made him clean out a toilet with his bare hands." *Id.* at 929.  Under a mistaken belief that the ten-year-old student "had intentionally clogged a clean toilet with paper[,]" a school teacher ordered the suspected student "to go into the bathroom, get a trash can, and pull the paper out of the toilet." *Id.*  The student "pulled the paper out of the toilet with his bare hands" and on "the bus ride home, some boys called [him] 'plumber boy.'" *Id.*

When it analyzed whether the teacher's conduct violated the lad's constitutional rights, *Harris* discussed and applied both *Garcia* and *Gerks*.  *See id.* at 930–31.  Ultimately, *Harris* concluded that the student's injuries did "not rise to the same conscience shocking level as the plaintiffs in *Garcia* and *Gerks*." *Id.* at 931.  Our Circuit gave three reasons.  *First*, the teacher's "actions were not so excessively cruel that [the student] was subjected to 'appreciable pain.'" *Id.*  *Second*, the teacher's "actions were not 'inspired by malice or sadism.'" *Id.*  And *third*, the teacher "may have been negligent . . . but her conduct falls far short of the deliberate and malicious conscience shocking conduct described in *Garcia* and *Gerks*." *Id.* (internal quotation marks omitted).[5]

Plaintiffs also direct the court to language from *Saldana v. Angleton Independent School District*, No. 3:16-CV-159, 2017 WL 1498066, at *3 (S.D. Tex. Apr. 25, 2017).  This district court case comes from outside our Circuit and relied on Fifth Circuit case law to reach its relevant holdings.  The court recognizes that, at first glance, *Saldana* appears helpful to

---

[5]     *Harris* proceeded to consider whether the second prong of qualified immunity analysis was met. *See Harris*, 273 F.3d at 931.  The Tenth Circuit concluded that the "clearly established right" prong wasn't satisfied and held that the school teacher was entitled to qualified immunity even if the student had a substantive due process claim. *Id.*

plaintiffs' arguments.  But upon closer inspection, *Saldana* too features facts that separate it too far from the allegations here.

Specifically, *Saldana* held that the plaintiff "sufficiently pleads that [defendant's] alleged actions would have violated clearly established law at the time" because "a reasonable school district employee would have understood that a school bus monitor's repeatedly striking a disabled, nonverbal student, without any provocation or justification, violated the child's substantive due process rights and that such conduct was objectively unreasonable in light of the clearly established law at the time."  *Id.*  *Saldana* noted that the plaintiff had alleged that "on thirty-seven bus trips, over a twenty-two day period, [defendant] viciously assaulted the minor Plaintiff, with no provocation whatsoever, a verified and documented *thirty-nine times*, including pinching, slapping, and striking him with a metal belt buckle, his school supplies and even his own tennis shoes."  *Id.* at *1.  The district court also pointed out that plaintiff had alleged that defendant's suffered injuries including a black eye and defendant's "behavior was so extreme that fellow [school district] employees felt 'shock and disgust' upon viewing the video evidence, and one exclaimed he felt 'f*&^ing sick' upon seeing 'a kid whipped on one of our busses like a dog!'"  *Id.* at *2.  *Saldana* ultimately denied defendant's motion to dismiss plaintiff's claim that defendant's "act of striking the minor with a bus seat belt violated the minor's liberty interest under the Fourteenth Amendment."  *Id.* at *3.

Plaintiffs' selection of case law—*Harris*, *Garcia*, *Gerks* (and even *Saldana*)—does not resolve questions about the constitutionality of defendant Moore's conduct.  While there are factual similarities between these cases and the factual allegations here that involve a school employee making physical contact with a mentally disabled student and transporting that child to a bathroom, a significant gap remains.  The allegations against defendant Moore lack numerous

factors that supported the holdings in *Garcia* and *Gerks*. *Gerks* involved extended exploitation of a mentally disabled child's known phobias, and *Garcia* and *Saldana* involved substantially more severe physical brutality and injury. In contrast, the allegations here—specifically, defendant Moore's conduct—are tamer. Reed Saunders was not beaten raw or repeatedly with an object. He suffered no significant physical injury from Moore's direct (non-supervisory) conduct. The boy was not left in solitude, let alone in a location that defendant Moore knew would frighten him idiosyncratically. And he was not forced to clean human excrement or use his bare hands to unclog a toilet.

These distinctions reveal that the body of precedent that plaintiffs cite leaves too undefined the "contours of the constitutional right at issue" here. *Perry v. Durborow*, 892 F.3d 1116, 1122 (10th Cir. 2018) (citation omitted). Given these factual distinctions, the cases that plaintiffs identify would not put a reasonable official in defendant Moore's position on notice that her conduct in this case violated Reed Saunders's substantive due process rights under the Fourteenth Amendment. *See id.* at 1126–27.

Plaintiffs thus fail to show that defendant Moore's alleged conduct violated Reed Saunders's clearly established substantive due process right under the Fourteenth Amendment to be free of a school district employee using her hands to press and pin down his arms (which he uses for limited sign language) numerous times, transferring him from his wheelchair to his walker, and dragging him by his walker to the bathroom. The second prong of the qualified immunity analysis for this claim remains unmet. Qualified immunity thus bars plaintiffs' substantive due process claim under both the Fourth Amendment and Fourteenth Amendment against defendant Moore (Count II).

### b. Whether the Equal Protection Right at Issue (Count IV) was Clearly Established

Plaintiffs also bring a § 1983 claim against defendant Moore for violating Reed Saunders's rights to equal protection under the Fourteenth Amendment.  Doc. 90 at 24–25 (Count IV).  "The Equal Protection Clause of the Fourteenth Amendment provides that no State shall 'deny to any person within its jurisdiction the equal protection of the laws.'"  *A.N. by & through Ponder v. Syling*, 928 F.3d 1191, 1196 (10th Cir. 2019) (quoting U.S. Const. amend. XIV, § 1).  The clause is "essentially a direction that all persons similarly situated should be treated alike, and is intended to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents[.]"  *Id.* (citations and internal quotation marks omitted).

An equal protection claim may be asserted, for a group of persons or even a "class of one." *Id.* (citation omitted).  "The paradigmatic 'class of one' case, [ ] sensibly conceived, is one in which a public official, with no conceivable basis for his action other than spite or some other improper motive (improper because unrelated to his public duties), comes down hard on a hapless private citizen."  *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1216 (10th Cir. 2011) (citation and internal quotation marks omitted).  "A plaintiff who 'alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment' states a claim for violation" of her right to equal protection. *Syling*, 928 F.3d at 1196 (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

Defendant Moore asserts that qualified immunity bars plaintiffs' equal protection claim against her because plaintiffs fail to show that Reed Saunders's Equal Protection rights under a class of one theory were clearly established.  *See* Doc. 105 at 8.  Plaintiffs' Response is less than

clear about whether plaintiffs dispute *defendant Moore's* invoking of qualified immunity here. Much of the relevant argument focuses on conduct specific to defendant Creamer—the striking of Reed Saunders. *See* Doc. 100 at 25 (discussing "[s]triking a . . . private citizen"). And the Response explains that "the question to be answered is whether a general statement of law preexisted Creamer's conduct and applied with obvious clarity to singling out a non-verbal, immobile, developmentally disabled, blind child to maliciously strike him, shout at him, pin his arms and drag him into a bathroom." Doc. 100 at 24. In any case, the court considers whether the child's equal protection right—to be free from a school para-educator using her hands to press his arms down numerous times, transfer him from his wheelchair to his walker, and drag him by his walker to the bathroom—was clearly established when defendant Moore's alleged conduct occurred.

Plaintiffs assert that defendant Moore violated Reed Saunders's clearly established rights under the Fourteenth Amendment's equal protection clause. In their response to defendant Moore's claim of qualified immunity, plaintiffs contend that a *general statement of law* provided that clear establishment and notice to defendant Moore that her conduct violated that constitutional right. The court now describes the circumstance in which courts have found a general statement of law sufficient to constitute a clearly established right for purposes of qualified immunity. Afterward, the court considers whether the circumstance here is one where that general statement of law *clearly established* Reed Saunders's equal protection rights.

The Supreme Court has "reiterate[d] the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" *White*, 137 S. Ct. at 552 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). But both the Supreme Court and the Tenth Circuit have clarified that "'general statements of the law are not inherently incapable of giving

fair and clear warning to officers' that their conduct violates a constitutional right, and that such statements provide the required notice when 'the unlawfulness' of their conduct is 'apparent' from the pre-existing law." *Syling*, 928 F.3d at 1198 (quoting *White*, 137 S. Ct. at 552). "In other words, [g]eneral statements of the law can clearly establish a right for qualified immunity purposes if they apply with obvious clarity to the specific conduct in question" and "this is so even though the very action in question has not previously been held unlawful." *Id.* (citations and internal quotation marks omitted).

In *Syling*, the Tenth Circuit held that a general statement of law had clearly established the plaintiff's equal protection rights. The court also explained why the general statement of law was sufficient to survive a qualified immunity defense. *Id.* at 1198–99. The "clearly established rule prohibiting intentional, arbitrary and unequal treatment of similarly situated individuals under the law applies with obvious clarity to Defendants' alleged actions and policy of discriminating . . . ." *Id.* at 1198. *Syling* found the rule "not extremely abstract or imprecise under the facts alleged here, but rather is relatively straightforward and not difficult to apply." *Id.* at 1199. And ultimately, the rule was "not too general to define clearly established law because 'the unlawfulness' of Defendants' conduct 'follow[s] immediately from the conclusion' that this general rule exists and is clearly established." *Id.* at 1198 (quoting *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)). The Tenth Circuit thus reasoned its holding to be "consistent with the purpose underlying the Supreme Court's statement of the 'clearly established law' standard in *Mullenix* and *Pauly*"—"to prevent plaintiffs from convert[ing] the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.* at 1198–99 (citation and internal quotation marks omitted).

46

Here, plaintiffs propose that their case is like *Syling*. *See* Doc. 100 at 24. They assert that law governing "class-of-one" equal protection claims provides a general statement of law that satisfies the "clearly established" analysis here. *Id.* Plaintiffs point to the Tenth Circuit's description of a class-of-one claim in *Kansas Penn Gaming*. *Id.* at 24–25. In that case, our Circuit explained that a plaintiff has a class-of-one claim when "a public official, with no conceivable basis for his action other than spite or some other improper motive (improper because unrelated to his public duties), comes down hard on a hapless private citizen." *Kan. Penn Gaming, LLC*, 656 F.3d at 1216 (citation and internal quotation marks omitted). Plaintiffs argue that this general statement of law applies with obvious clarity to defendant Moore's actions. *See* Doc. 100 at 24–25.

The court disagrees. The "comes down hard" rule is no paragon of clarity under the facts alleged here. The rule's lack of clear applicability is apparent when compared to the equal protection rule in *Syling* that, our Circuit found, applied to the defendants' alleged action with sufficiently obvious clarity. In *Syling*, the "clearly established rule prohibiting intentional, arbitrary and unequal treatment of similarly situated individuals under the law applie[d] with obvious clarity to Defendants' alleged actions and policy of discriminating . . . ." *Syling*, 928 F.3d at 1198. The phrase "unequal treatment" produced a binary analysis. Treatment of similarly situated individuals was either equal or unequal. The officials either disclosed the juvenile arrestee's information, or they didn't. The rule and the resulting analysis were "relatively straightforward and not difficult to apply." *Id.* at 1199.

In contrast, analyzing whether defendant Moore spitefully or otherwise improperly "c[a]me[ ] down hard" on Reed Saunders is not so straightforward or easy. Similarly, the "no conceivable basis for his action other than spite or some other improper motive (improper

47

because unrelated to his public duties)" part of the rule doesn't apply to defendant Moore's alleged conduct with obvious clarity. Plaintiffs' arguments on this point seem focused on defendant Creamer's conduct. *See* Doc. 100 at 25 ("Striking a developmentally disabled, blind, immobile non-communicative private citizen as he sits in his wheelchair, out of malice, is such a clear standard, and Defendants would have known better than to do it."). As defendant Moore points out in her Reply, the Third Amended Complaint does "not allege Moore struck Reed, let alone did so out of malice." Doc. 105 at 9.

While prolix filings have their own shortcomings, plaintiffs' analysis here of "clearly established" law favors concision at the sake of clarity. *See* Doc. 100 at 24–25. Plaintiffs mention the Supreme Court's *Engquist* decision and casually integrate (1) that case's discussion of a "clear standard" for purpose of class-of-one equal protection claims, with (2) *Syling*'s general statement of law analysis. *Id.* But *Engquist* does not discuss qualified immunity. *See Engquist v. Or. Dept. of Agric.*, 553 U.S. 591 (2008). And *Syling*, though it does discuss qualified immunity, neither mentions the phrase "clear statement" nor cites *Engquist*. The court endeavors to discern litigants' legal arguments, but here, plaintiffs left too few breadcrumbs for the court to follow its trail of analysis. Plaintiffs fail to explain adequately or argue convincingly that *Engquist* and *Syling* mean that plaintiffs here overcome the clearly established prong of defendant Moore's qualified immunity defense for the equal protection claim.

At bottom, the unlawfulness of defendant Moore's alleged conduct does not follow immediately from the conclusion that the general rule—that plaintiffs quote from *Kansas Penn Gaming*—exists. Under our Circuit's analysis in *Syling*, the court cannot conclude that this general rule is sufficiently specific to have placed defendant Moore on notice that she would violate Reed Saunders's right to equal protection if she used her hands to press Reed Saunders's

arms down numerous times, transferred him from his wheelchair to his walker, and dragged him by his walker to the bathroom. That rule is too general to define clearly established law here.

Plaintiffs' equal protection claim thus fails to survive the second prong of defendant Moore's qualified immunity defense. The doctrine of qualified immunity bars this claim against her. The court grants defendant Moore's Motion to Dismiss the equal protection claim against her under Count IV.

### c. Whether the Doctrine of Qualified Immunity Bars Plaintiffs' Danger Creation Claims (Count III) Against Defendants Moore and Gray

Plaintiffs bring "danger creation" claims against defendants Moore and Gray. *See* Doc. 90 at 23 (Third. Am. Compl.). In response, those defendants invoke qualified immunity. *See* Doc. 97 at 10–11, 13–14, 16–17. Plaintiffs object. *See* Doc. 100 at 22–23, 25. Defendants reply that plaintiffs "have failed to carry their 'heavy-burden' to show Reed's . . . right to be free from danger created by private third parties [was] clearly established." Doc. 105 at 10. The court agrees with defendants.

Plaintiffs' analysis on this point is less than full-throated. *See* Doc. 100 at 25. Plaintiffs assert that "Tenth Circuit cases have held that school employees can be held liable for 'danger creation,' i.e., taking actions that increase a student's vulnerability to danger." Doc. 100 at 25 (citing *Dahn v. Adoption All.*, 164 F. Supp. 3d 1294, 1314 (D. Colo. 2016), *rev'd and remanded sub nom. Dahn v. Amedei*, 867 F.3d 1178 (10th Cir. 2017)). Plaintiffs argue that this "caselaw placed Moore and Gray on notice of the constitutional transgressions they would commit[.]" Doc. 100 at 25. But plaintiffs elaborate no further, and don't cite directly any of the Tenth Circuit cases they reference. Nor do plaintiffs explain why those cases satisfy the "clearly established" prong of the qualified immunity analysis. Defendants Moore and Gray argue persuasively that plaintiffs' clearly established rights analysis about the danger creation claims

49

"is conclusory, undeveloped, and not based on caselaw involving similar circumstances particularized to the facts of this case."  Doc. 105 at 10; *see also* Doc. 105 at 15.

Plaintiffs fail to survive the second prong of defendants Moore and Gray's qualified immunity defense for danger creation claims.  *See Crowson*, 983 F.3d at 1178 (explaining that when "a § 1983 defendant asserts qualified immunity, this affirmative defense creates a presumption that [the defendant is] immune from suit" and defendant then bears the burden to "overcome" that presumption).  The doctrine of qualified immunity bars these claims against defendants Moore and Gray, and the court grants their Motion to Dismiss the danger creation claims under Count III.

> ### d.  Whether the Doctrine of Qualified Immunity Bars the Supervisory Liability Claim Against Defendant Gray Under Count I for Failure to Train

Plaintiffs bring a supervisory liability claim against defendant Gray based on an alleged failure to train.  Doc. 90 at 20 (Third. Am. Compl.).  Defendant Gray argues that she is entitled to qualified immunity on this claim for three reasons.  *See* Doc. 97 at 14–17.  She argues:  *first*, there was no subordinate violation; *second,* she did not personally participate in any alleged violations; and *third*, the law was not clearly established.  *See id.*  Plaintiffs respond to each reason.  *See* Doc. 100 at 22, 25–27.  The court now considers them in that order.

> #### i.  Whether There was a Subordinate Violation

Defendant Gray argues that plaintiffs' "allegations fail to show Creamer violated Reed's constitutional rights."  Doc. 97 at 15.  She supports this argument by citing several cases from our court and the Tenth Circuit.  *See id.*  The court construes this argument to imply that defendant Creamer's alleged striking or threatening of Reed Saunders is not severe enough to state a constitutional violation.  The court disagrees.

The Tenth Circuit has held that "at some point, excessive corporal punishment violates [a student's] substantive due process rights." *Garcia*, 817 F.2d at 653.  Our Circuit explained that "the substantive due process inquiry in school corporal punishment cases [asks] whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *Id.* at 655 (citation and internal quotation marks omitted).  Defendant Gray invites the court to compare the alleged conduct of defendant Creamer (her subordinate) to the conduct in *Couture*, *Muskrat*, and *Holloman*—three cases holding that use of force on a student fell short of unconstitutional.  *See* Doc. 97 at 15 (first citing *Couture*, 535 F.3d at 1253–56; then citing *Muskrat v. Deer Creek Pub. Schs.*, 715 F.3d 775, 786–88 (10th Cir. 2013); then citing *Holloman v. Unified Sch. Dist. 259*, No. 05-1180-JTM, 2006 WL 1675932, at *1 (D. Kan. June 15, 2006)).

These cases all differ from the allegations here.  *Muskrat* considered the constitutionality of school employees' various uses of force on an elementary school student.  715 F.3d at 789–80.  The student had mental disabilities that placed his cognitive ability akin to a two to three-year-old's, and impaired gross and fine motor skills plus balance problems and a pattern of seizures.  *Id.* at 780.  The Tenth Circuit held that an unprovoked mild slap or "pop" to the student's face-cheek did not shock the conscience for purposes of a Fourteenth Amendment violation where there was no evidence in the summary judgment record that the act was a brutal and inhumane abuse of official power.  *Id.* at 787.  The court reached the same conclusions about (1) a slap on the student's arm, which was unsupported by any evidence of lasting harm or malice, and (2) restraining the student at his desk for a few minutes.  *Id.*  None of these acts, our

51

Circuit held, were unconstitutional under the Fourteenth Amendment's substantive due process doctrine.  *Id.*

*Holloman* involved a student who did "not have physical or mental handicaps, but has behavior problems that resulted in her needing special education classes."  *Holloman*, 2006 WL 1675932, at *1.  The student had "repeatedly been in trouble at school for being tardy, for using foul and vulgar language in front of other students, for engaging in physical fights with other students and physically fighting with teachers."  *Id.*  Our court held that a "single slap from a teacher that left no scars and required no medical attention does not amount to a substantive due process claim."  *Holloman*, 2006 WL 1675932, at *7.  *Holloman* also noted the absence of "evidence that the conduct was inspired by malice or sadism," and that the slap "appears to be a[n] incident where a teacher exerted an unwise level of force that was inappropriate and regrettable."  *Id.*

Here, plaintiffs allege that defendant Creamer struck a child with a number of physical and mental disabilities that made him obviously and superlatively vulnerable.  Physically attacking a child so vulnerable makes the alleged conduct sufficiently disproportionate, outrageous, and potentially harmful that a reasonable trier of fact could find it conscience shocking.  And *Holloman* does not caution otherwise.  Unlike *Holloman*, the allegations here feature facts that permit a reasonable finding or inference of malicious or sadistic inspiration.  The facts that plaintiffs allege here about Reed Saunders's physical and mental condition further distinguish this case from *Holloman*—in which the student who received the teacher's blow was not disabled.

Though less obvious, *Muskrat* also differs from the facts here on similar grounds.  The lad on the receiving end of the force used in *Muskrat* was, like Reed Saunders, mentally and

physically disabled.  But his physical limitations were less substantial than Reed's.  The *Muskrat* youngster had "impaired gross and fine motor skills, as well as balance problems and a pattern of seizures."  *Muskrat*, 715 F.3d at 780.  In contrast, Reed Saunders, even with the aid of a wheelchair or walker, is completely dependent upon others for locomotion.  Doc. 90 at 2 (Third Am. Compl. ¶ 7).  He is also blind and non-verbal.  *Id.* (Third Am. Compl. ¶¶ 4–5).

These facts about the child involved is, in the court's judgment, relevant to the proportionality of (1) the need presented and (2) what the government official did to the student. Here, the child was so physically limited that he hardly could produce or direct force of his own. *Id.* at 2, 8–9 (Third Am. Compl. ¶¶ 4–7, 44).  And Reed Saunders was so mentally limited that he was unable to misbehave or even understand the purpose of physical punishment.  *Id.* at 8–9, 11 (Third Am. Compl. ¶¶ 40, 48–49, 62).  Plaintiffs allege limitations that are obvious for the most part, and that Reed Saunders is completely dependent on others for activities of daily life.  *See id.* at 2, 4, 8–9 (Third Am. Compl. ¶¶ 5, 16, 44).

There's something particularly appalling about striking a blind person.  The striker willfully exploits an obvious and profound asymmetry.  The asymmetry is even more pronounced in the facts alleged about Reed Saunders.  Not only is he blind, but he is a child— he's a blind child in a wheelchair who is severely mentally disabled and unable to speak.

Striking and then shouting at and threatening a child in Reed Saunders's shoes—who poses no provocation or threat himself, cannot know why he's being hit, and lacks the physical ability to see it coming, call for help, flee, or protect himself—presents a disproportionality relative to the need presented that is grotesque.  Plaintiffs allege abuse that a reasonable jury could find brutal, inhumane, and conscience shocking.

Defendant Creamer's alleged aggression, anger, continued shouting and pushing of the boy's hand (even after someone else intervened), and the threats of future harm can support, if proved true, a reasonable finding or inference of malicious inspiration. *Id.* at 9–11 (Third Am. Compl. ¶¶ 50–54, 61). To deem the alleged conduct here a mere "careless or unwise excess of zeal" requires resort to tortured reasoning that would disfigure the words "careless" and "unwise." The court thus rejects defendant Gray's argument that plaintiffs fail to allege sufficiently a subordinate violation for purposes of alleging defendant Gray's supervisory liability.[6]

The court now turns to consider the allegations of defendant Gray's involvement.

### ii. Whether Defendant Gray Participated Personally in any Alleged Violation (Affirmative Link)

Defendant Gray argues that she cannot face supervisory liability because she did not participate personally in defendant Creamer's alleged violation. Doc. 97 at 15. She asserts that the court should discard plaintiffs' allegations about her training of subordinates and their use of pain to control student physically because those allegations are "without factual basis[.]" Doc. 97 at 16. This argument ignores the standard that applies at the motion to dismiss stage. In contrast to mere legal conclusions, the court must assume factual allegations are true at this stage. *Iqbal*, 556 U.S. at 678–79.

As plaintiffs point out in the Response to the Motion to Dismiss, *see* Doc. 100 at 26–27, the Third Amended Complaint alleges facts about defendant Gray's training of subordinate employees like defendant Creamer. These allegations involve her training of her para-educators

---

[6]     The court concludes plaintiffs have alleged a subordinate violation under the Fourteenth Amendment. So, the court does not proceed to consider whether they also might have alleged a subordinate violation under the Fourth Amendment. The court thus declines defendant Gray's invitation to compare the facts plaintiffs alleged about her to *Couture*—a case involving Fourth Amendment claims.

to harm and threaten the students, and to bite or sit on children to control them—including Reed Saunders.  *See, e.g.*, Doc. 90 at 6, 13 (Third Am. Compl. ¶¶ 31, 76); Doc. 90 at 14 (Third Am. Compl. ¶ 79(f) ("They were trained . . . to strike and threaten Reed Saunders and to use pain to control him."); Doc. 90 at 15 (Third Am. Compl. ¶ 80) ("The training they received from Defendant Gray was actually to harm, threaten and physically restrain Reed Saunders in ways that caused him appreciable physical pain . . . .").

In addition to these allegations about what defendant Gray trained subordinates to do, plaintiffs also allege that defendant Gray *failed* to train her subordinate employees other things— like "how to comply with the USD 353 written policies regarding student emergency safety interventions, restraints, physical interventions and punishments," or "when and where it would be appropriate to punish, restrain, threaten or strike a student like Reed Saunders" or "how to document their emergency safety interventions, retrains,[7] physical interventions and/or punishments."  *See, e.g.*, *id.* at 14 (Third Am. Compl. ¶ 79(a)–(e)).

Defendant Gray argues that her alleged training did not cause the constitutional violations that Reed Saunders allegedly sustained because her subordinates—defendants Creamer and Moore—did not bite or sit on the boy.  Doc. 97 at 16.  She cites *Scott v. Mid-Del Schools Board of Education*, 724 F. App'x 650, 656–57 (10th Cir. 2018) for the purported rule that supervisory liability claims depend on tracing the alleged violation to the supervisor's policy.  *Id.*  *Scott* actually involved a danger creation claim, but the court construes defendant Gray's argument to imply that this distinction does not matter for the point about causation for which she cites this case.  Plaintiffs respond that one *can* trace the alleged violations to defendant Gray via her affirmative training and deliberate indifference.  *See* Doc. 100 at 27.

---

[7]      The court is unsure whether "retrains" is a misspelling of "restraints" or refers instead to training someone again.

The court agrees with plaintiffs' reasoning.  Defendant Gray allegedly trained the para-educators she supervised to use pain to control their students.  Doc. 90 at 6, 13, 15–16 (Third Am. Compl. ¶¶ 31, 76, 83–85).  While striking is different than pressure-point techniques, sitting on, or biting, they all use physical force and pain to influence a child's behavior.  Given the allegations plaintiffs advance, defendant Creamer's use of force on Reed Saunders in the gymnasium is traceable to the alleged training that her supervisor—defendant Gray—provided her.

Moreover, the Third Amended Complaint alleges enough facts to support a reasonable finding or inference of deliberate indifference.  "Where a superior's failure to train amounts to deliberate indifference to the rights of persons with whom his subordinates come into contact, the inadequacy of training may serve as the basis for § 1983 liability."  *Sutton v. Utah State Sch. for Deaf & Blind*, 173 F.3d 1226, 1240 (10th Cir. 1999).  "To be guilty of deliberate indifference, the defendant must know he is creating a substantial risk of bodily harm."  *Green v. Branson*, 108 F.3d 1296, 1302 (10th Cir. 1997) (citation and internal quotation marks omitted).

Here, the allegations can support a reasonable finding or inference that defendant Gray had actual notice that her training was substantially likely to harm Reed Saunders physically and even infringe on his constitutional rights.  Plaintiffs allege that defendant Gray had received multiple complaints about her subordinates' physical treatment of Reed Saunders.  Doc. 90 at 13–14 (Third Am. Compl. ¶ 77).  They allege that defendant Gray had "ignor[ed]" those "repeated reports of inappropriate supervision of her son[.]"  *Id.* at 16 (Third Am. Compl. ¶ 87(a)).  And, she allegedly "endors[ed] terrible methods of interacting with Reed Saunders, including pouring cold water on erections, biting him, sitting on him and using military-style pressure points[.]"  *Id.* at 15 (Third Am. Compl. ¶ 83).

Given the repeated notification that defendant Gray allegedly received about her subordinates' physical treatment of Reed Saunders, the court cannot dismiss these allegations as inadequate to support an affirmative link between defendant Gray and her subordinate's alleged violations of plaintiff's constitutional right(s).  While defendant Gray argues that she was not personally involved in defendant Creamer's conduct in the gymnasium, the allegations about her training practices and notice of her subordinate's prior physical treatment of Reed Saunders provide the involvement or causation necessary to state this claim for supervisory liability under § 1983.

The court thus turns to defendant Gray's final argument against plaintiffs' claim under Count I and considers whether she violated Reed Saunders's clearly established right.

### iii.  Whether the Law was Clearly Established for Purposes of Qualified Immunity

Defendant Gray asserts that case law existing in January 2019 particularized to the alleged facts of this case did not show her that her conduct violated one or more of Reed Saunders's clearly established rights.  Doc. 97 at 17.  In response, plaintiffs direct the court to *Sutton*, 173 F.3d at 1240–1241.  Defendant Gray replies that *Sutton* won't cut it.  Doc. 105 at 14–16.  She reasons that *Sutton* dealt only with a defendant who held policymaking authority, and she doesn't fit that label.  *See id.*  This attempt to distinguish *Sutton* enjoys some superficial appeal but ultimately falls short of persuasive.  Defendant Gray correctly notes that *Sutton* involved a school principal, and that, in contrast, she is a mere teacher.  But defendant Gray unfairly limits *Sutton*'s language and guidance.

*Sutton* explained:  "Where a *superior's* failure to train amounts to deliberate indifference to the rights of persons with whom his subordinates come into contact, the inadequacy of training may serve as the basis for § 1983 liability."  *Sutton*, 173 F.3d at 1240 (emphasis added).

57

Defendant Gray fails to persuade the court that when *Sutton* says *superior*, it really means the *top official*.

Defendant Gray's citation to *Glover v. Gartman* does not caution otherwise.  *See* Doc. 105 at 15 (quoting *Glover*, 899 F. Supp. 2d 1115 (D.N.M. 2012)).  *Glover* concluded that some of plaintiff's allegations "cannot serve as the basis for a 42 U.S.C. § 1983 claim *for supervisor liability*" because a "supervisor liability claim, rather, can only be claimed against an individual acting in a supervisory role, such as a warden or a sheriff, and not an individual officer."  *Glover*, 899 F. Supp. 2d at 1144 n.7.  *Glover* merely explained that supervisory liability didn't apply because plaintiff was "not alleging that Rice or Collins was *acting in a supervisory role*[.]"  *Id.* at 1143–44 (emphasis added).  Neither the language nor analysis suggests that supervisory liability is *limited* to top officials such as a warden or sheriff.  Instead, as *Glover* phrases it, supervisory liability can attach to persons "acting in a supervisory role."  *Id.*

Unlike *Glover*, plaintiffs here allege that defendant Gray acted in a supervisory role, and not merely as an individual officer.  Defendant Gray fails to explain *why* she, someone who allegedly supervised and trained subordinate employees, is not a superior, supervisor, or official with policymaking authority.

*Sutton* is not identical to the facts alleged here, but it needn't be, and it's close enough. The case considered a school principal's liability under § 1983 for failure to train employees after the principal had received reports of repeated sexual assaults on a severely disabled student. *See Sutton*, 173 F.3d at 1240–41.  The Tenth Circuit thought that the defendant-supervisor ought to have known of the violative nature of his failure to train even then—in 1995.  *See id.* (holding that "a supervisor's liability for failing to train subordinates or to implement a policy to prevent a sexual assault on a severely disabled child like [plaintiff] was clearly established as of February

1995 . . . ."). Here, the court concludes, a supervisor's liability for failing to train subordinates or implement a policy to prevent physical mistreatment of a severely disabled child like Reed Saunders was clearly established as of January 2019 when the gymnasium incident allegedly occurred.

Plaintiffs have discharged their burden to show that they sufficiently allege defendant Gray's failure to train her subordinates violated Reed Saunders's then clearly established rights. The court thus denies defendant Gray's Motion to Dismiss this claim under Count I on qualified immunity grounds.

### e. Whether the Doctrine of Qualified Immunity Bars Supervisory Liability Claim Against Defendant Gray Under Count V

Plaintiffs bring another supervisory liability claim against defendant Gray under Count V. *See* Doc. 90 at 26. This claim rests, *in part*, on defendant Gray's alleged conduct during the January 2019 incident. Doc. 100 at 28. The court already explained—in its discussion of the supervisory liability claim for failure to train under Count I—why plaintiffs have alleged enough to show an underlying subordinate violation. *See supra* pp. 50–54.

Here, the parties dispute whether plaintiffs allege enough to support a reasonable finding or inference that defendant Gray participated or acquiesced in any violation of Reed Saunders's constitutional rights. *See* Doc. 100 at 21; Doc. 105 at 17. But plaintiffs also support Count V by their allegations about defendant Gray's training of Creamer and Moore. Doc. 100 at 21–22. The court already explained why the allegations about defendant Gray's training (and lack of training) of subordinates suffices to support a finding or reasonable inference of an affirmative link between the subordinate's unconstitutional conduct and defendant-supervisor Gray. *See supra* pp. 54–57. Count V appears to allege the same as Count I, plus some allegations about the failure to intervene. The court already has concluded that defendant Gray's alleged supervisory

conduct—failing to train defendant Creamer properly—violated Reed Saunders's clearly established substantive due process rights under the Fourteenth Amendment. *See supra* pp. 50–59.

Plaintiffs' pleading style smudges the line separating the claim against defendant Gray in Count I from the claim in Count V. The court agrees with defendant Gray. Plaintiffs sewed confusion by pleading these two supervisory liability claims on separate but apparently overlapping theories of defendant Gray's involvement. But, as the court already explained, defendant Gray has not explained why that overlap provides a proper basis for dismissing one claim or the other. Plaintiffs are allowed to plead alternative claims for relief. *See* Fed. R. Civ. P. 8. So the court won't dismiss either claim on the grounds that defendant Gray contends the claims are duplicative.

The court concludes, for many of the reasons it discussed about Count I, that plaintiffs have alleged facts sufficient to state a claim against defendant Gray under Count V for supervisory liability under § 1983, and have discharged their burden under the doctrine of qualified immunity to show that she violated Reed Saunders's clearly established right. The court thus denies defendant Gray's Motion to Dismiss the supervisory liability claim under Count V.

This conclusion concludes the court's analysis of defendants Moore and Gray's arguments for dismissing plaintiffs' *federal* law claims against them. To recap, the court dismisses all federal claims against defendant Moore because the doctrine of qualified immunity bars those claims (Counts II, III, IV). The court also dismisses the danger creation claim against defendant Gray (Count III). In contrast, the court declines to dismiss the supervisory liability

claims against defendant Gray (Counts I and V).  The Motion to Dismiss (Doc. 96) is thus granted in part and denied in part as explained in full by this Order.

Next, the court considers plaintiffs' Kansas law claims against defendants Moore and Gray.

### C.    Kansas State Law Claims Against Defendants Moore and Gray

#### 1.    Whether Defendants Moore and Gray enjoy any Kansas Tort Claims Act Immunities

Defendants Moore and Gray invoke three immunities to argue that they are spared from plaintiffs' state law claims under the Kansas Tort Claims Act.  Doc. 97 at 26.  Defendants bear the burden of establishing a Kansas Tort Claims Act immunity defense.  *Williams v. C-U-Out Bail Bonds, LLC*, 450 P.3d 330, 344 (Kan. 2019).  Defendants Moore and Gray invoke Kan. Stat. Ann. § 75-6104(d), (e), and (i) to assert that they are entitled to enforcement, discretionary function, and adoptive immunities.  *See* Doc. 97 at 26.

These three provisions provide:

> A governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from:
>
> > (d) adoption or enforcement of, or failure to adopt or enforce, any written personnel policy which protects persons' health or safety unless a duty of care, independent of such policy, is owed to the specific individual injured, except that the finder of fact may consider the failure to comply with any written personnel policy in determining the question of negligence;
> >
> > (e) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion is abused and regardless of the level of discretion involved;[8]
>
> . . .

---

[8]    Plaintiffs point out that subsection (e) is subject to an "independent duty" exception like the explicit exception that subsection (d) provides.  The "existence of a common-law duty prevents application of the KTCA discretionary function exception."  *Williams*, 450 P.3d at 345.

> (i) any claim which is limited or barred by any other law or which is for injuries or property damage against an officer, employee or agent where the individual is immune from suit or damages . . . .

Kan. Stat. Ann. § 75-6104.

Plaintiffs argue that defendants' reliance on § 75-6104(d) and (e) fail because an exception applies.  *See* Doc. 100 at 35.  Plaintiffs allege that defendants Gray and Moore owed independent common law duties to protect Reed Saunders.  *Id.*  And plaintiffs reason that § 75-6104(i) does not apply here because defendants Moore and Gray fail to show what "other law" would bar the claims.  *Id.*  Plaintiffs assert that the Coverdell Act cannot serve as that "other law" because it does not apply to a teacher's gross negligence, and plaintiffs have alleged conduct that, at minimum, was grossly negligent.  Doc. 100 at 35–36.  Defendants Moore and Gray do not address these arguments in their Reply.  *See* Doc. 107.

Defendants bear the burden to establish that any of these KTCA immunities apply. *Williams*, 450 P.3d at 344.  Defendants Moore and Gray have failed to discharge that burden here.  The court thus declines to dismiss, on immunity grounds, any of the state law claims against defendants Moore and Gray under the Kansas Tort Claims Act.

### 2. Whether Plaintiffs Plausibly Plead Battery/Assault Against Defendants Moore and Gray (Count VII & XI)

Plaintiffs bring Kansas state law claims against defendants Moore and Gray for battery/assault.  Doc. 90 at 28, 33 (Counts VII, XI).  Defendant Gray moves to dismiss this claim against her because plaintiffs never allege that she threatened, touched, or restrained Reed Saunders.  *See* Doc. 97 at 19–21.  Plaintiffs fail to respond to this argument.  *See* Doc. 100.  The court grants the Motion to Dismiss this claim against defendant Gray (Count XI).

Defendant Moore moves to dismiss this battery/assault claim against her because her contact with Reed Saunders was privileged. *See* Doc. 97 at 19–21. She explains that privileged contact is a defense to a battery claim and cites *First Southern Baptist Church v. Nowak*, 209 P.3d 764, No. 100,252, 2009 WL 1858255, at *4 (Kan. Ct. App. June 26, 2009) for its holding that a 15–20 second restraint causing no injury imposed to remove a disorderly occupant from church was reasonable and privileged. Doc. 97 at 21–22. The court construes the citation as inviting the court to find defendant Moore's conduct like the conduct deemed privileged in *Nowak*. But defendant Moore fails to elaborate or explain how the alleged conduct here was privileged. She also fails to explain how she can prevail on a defense at the motion to dismiss stage.

Plaintiffs respond that *Nowak* differs from the facts here. Doc. 100 at 28. The court agrees with plaintiffs on this point. *Nowak* involved "a brief 15 to 20-second restraint causing no injury" of an "out of control" "angry and shouting" intruder at a church who "kept screaming and kept trying to get to the Pastor" and whose conduct led the alleged tortfeasor to believe that "others were in danger." *Nowak*, 2009 WL 1858255, at *4. Unlike *Nowak*'s unruly and belligerent woman at a church whose conduct appeared to put others at risk, plaintiffs here allege that defendant Moore battered a severely disabled blind child in a wheelchair or walker unable to move without assistance of others. *See* Doc. 90. at 2, 8–9, 11 (Third Am. Compl. ¶¶ 4–7, 40, 44, 48–49, 62). Plaintiffs also allege that the episode lasted more than mere seconds and injured Reed Saunders. *Id.* at 9, 30 (Third Am. Compl. ¶¶ 45, 167). Given the substantial and obvious differences between *Nowak* and the facts alleged here, *Nowak* does not suggest that defendant Moore's touching of Reed Saunders was reasonable under the circumstances or privileged under Kansas tort law.

Even if a motion to dismiss were the proper occasion to raise a privilege defense, defendant Moore fails to persuade the court that her contact with Reed Saunders enjoys that status as a matter of law.  The court denies the Motion to Dismiss the battery/assault claim against defendant Moore under Count VII.

For similar reasons, defendant Moore has failed to persuade the court that a privilege justifies dismissing the battery claim under Count XI.  Defendant Moore also asserts that the battery claims asserted separately in Counts VII and XI are duplicative.  *See* Doc. 97 at 22.  But she cites no authority to support her argument this duplication requires (or even permits) the court to dismiss one of the claims.  Plaintiffs' method of pleading—though apparently adopted to promote clarity—creates confusion.  And the parties' inability to get on the same page does little to clear the clouds.  But alternative pleading is permitted in federal court and, fortunately, the parties and the court can resolve any uncertainty about these claims at a later stage in the long trek towards trial.  The court denies the Motion to Dismiss the battery claim against defendant Moore under Count XI.

### 3. Whether Plaintiffs Fail to State False Imprisonment Claims Against Defendants Moore and Gray (Count X)

Plaintiffs bring false imprisonment claims against defendants Moore and Gray under Count X.  "In an action for false arrest or false imprisonment, all that is necessary [under Kansas law] is that the individual be restrained of his liberty without any sufficient legal cause therefor, and by words or acts which the one being restrained fears to disregard.  It is universally held the action of false imprisonment always includes the element of an assault in the technical sense." *Thompson v. Gen. Fin. Co.*, 468 P.2d 269, 280 (Kan. 1970).

### a.   False Imprisonment Claims against Defendant Gray

Defendant Gray argues that plaintiffs fail to state a false imprisonment claim against her because she did not touch, threaten, or confine Reed Saunders.  *See* Doc. 97 at 21.  Plaintiffs reject this argument.  *See* Doc. 100 at 30–31.  Plaintiffs reason that they've alleged adequately that defendant Gray accomplished the tort of false imprisonment because they allege that she encouraged her subordinates to restrain Reed Saunders, and that *Thompson* recognizes these "words or acts" as sufficient to state a claim for false imprisonment.  Doc. 100 at 31.  In her Reply, defendant Gray counterargues that plaintiffs' allegation that she "encouraged" Creamer and Moore is conclusory because plaintiffs provide no detail describing Gray's alleged "words or acts" purportedly encouraging Creamer and Moore to restrain Reed Saunders.  Doc. 105 at 21.

*Thompson*'s mention of "words or acts" connects to the alleged tortfeasor's conduct that "the one being restrained fears to disregard." *Thompson*, 468 P.2d at 280.  Such words or acts differ from those encouraging another tortfeasor's conduct.  Here, plaintiffs allege no words or acts by defendant Gray that Reed Saunders feared to disregard.  Moreover, even if "words or acts" encompassed directions to other tortfeasors (rather than the tort victim), the pleading here alleges little about these "words or acts."  The "too conclusory" argument finally lands—the court agrees with defendant Gray's analysis here.  Doc. 105 at 21.

Plaintiffs explain that they "are targeting Gray's own personal conduct, her own words and deeds, that imprisoned Reed [Saunders]" rather than asserting that defendant Gray is vicariously liable.  Doc. 100 at 31.  But plaintiffs fail to allege facts about words or deeds.  They merely allege that defendant Gray "acquiesced, encouraged and condoned the behaviors of Creamer and Moore, as their conduct occurred in full view of Defendant Gray, and Defendant Gray approved of it."  Doc. 90 at 9 (Third Am. Compl. ¶ 47).  They allege no words or acts to

support a finding or reasonable inference that defendant Gray's involvement in the incident could suffice to state a false imprisonment claim against her. The court thus grants the Motion to Dismiss the false imprisonment claim against defendant Gray under Count X. For similar reasons, the court grants the Motion to Dismiss the false imprisonment claim against defendant Gray under Count XIII.

### b. False Imprisonment Claims Against Defendant Moore

Defendant Moore argues that plaintiffs' false imprisonment claim against her fails because her contact with Reed Saunders was privileged. *See* Doc. 97 at 21–22. This is the same argument she made against the battery/assault claims. *See id.* For the same reasons the court rejected this argument earlier, the court finds it unpersuasive here. The court denies defendant Moore's Motion to Dismiss the false imprisonment claim against her under Count X. For the same reasons, the court declines to dismiss the false imprisonment claim against her under Count XIII. Fed. R. Civ. P. 8 authorizes parties to plead in the alternative. And to the extent that these two claims against defendant Moore ought to form a single claim, the parties and the court can address that argument at a later stage of litigation. *See* D. Kan. Rule 16.2(a)–(b).

### 4. Whether Plaintiffs Fail to State a Claim for Negligent Supervision of Employee Against Defendant Gray (Count VIII)

Defendant Gray asks the court to dismiss plaintiffs' claim for negligent supervision against her. Doc. 97 at 19–20. She argues that the claim fails because she is not an employer. Doc. 97 at 19–20; Doc. 105 at 18. Defendant Gray reasons that because she "is an employee, not an employer, she cannot be liable for negligence arising from an employer's duty of reasonable care to prevent harm to third parties caused by employees acting in the scope of their employment." Doc. 97 at 20.

Plaintiffs respond that they adequately plead she owed that duty.  Doc. 100 at 29 (citing Doc. 90 at 30 (Third Am. Compl. ¶ 169) ("Defendants [USD 353] and Gray owed Plaintiff Reed Saunders a duty to control and supervise Defendants Gray, Moore, and Creamer.")).  But plaintiffs fail to address defendant Gray's point that she's merely a school district employee—not an employer—who owes no duty to third parties as an *employer*.  In short, plaintiffs don't allege that defendant Gray employed anyone.  And if defendant Gray owes some other duty of reasonable care to third parties to control defendants Moore and Creamer, plaintiffs fail to specify that duty.  *See id.*

Plaintiffs fail to explain how they adequately state a claim for breach of the employer's duty against defendant Gray—an employee.  The court thus grants defendant Gray's Motion to Dismiss the claim against her under Count VIII for failure to supervise employee(s).

### 5. Whether Plaintiffs Failed to State a Claim for Negligent Supervision of Children against Defendants Moore and Gray (Count IX)

The parties dispute whether plaintiffs have stated a claim for negligent supervision of children against defendants Moore and Gray.  The dispute derives from their underlying dispute over whether, like school districts themselves, *teachers* owe a duty to supervise students properly and take reasonable steps to protect their safety.  Doc. 100 at 30; Doc. 105 at 18–21.  Plaintiffs say yes; defendants Moore and Gray say otherwise.

Defendants argue that since the school district is the only one who bears that duty, the claims against the employees—defendants Moore and Gray—are just official capacity claims against two employees that merely assert liability against the employer defendant USD 353.  Doc. 105 at 20–21.  Defendants Moore and Gray object because plaintiffs already are bringing a claim for direct liability against the school district based upon its employees' failures to take reasonable safety to protect Reed Saunders's safety.  *Id.*

Even if defendants Moore and Gray are right, they leave unsaid why that merits dismissal of the claims under Count IX.  Their arguments about duplicative claims have surfaced throughout their briefs.  But they fail to show the court why it must dismiss this claim at this time—even if it is duplicative.

Their citation to the Kansas Supreme Court case *Reardon for Est. of Parsons v. King*, 452 P.3d 849 (Kan. 2019) does not help defendants Moore and Gray's argument, for reasons the court discussed when ruling on similar issues presented by defendant USD 353's Motion to Dismiss.  As discussed above, *Reardon* rejected the splitting of negligence into various distinct causes of action via particularized characterizations of the general duty of reasonable care. *Reardon*, 452 P.3d at 855–56.  The court does not read that case to hold, however, that a court must dismiss an official capacity claim against an employee when plaintiff also brings a claim against the employer.  *Reardon* held that the "jury instructions did not adequately or accurately explain the elements of [plaintiff's] negligence claim" and that this "prevented the jury from ever being able to consider whether [plaintiff] had sufficiently proven each of the elements of the claim."  *Reardon*, 452 P.3d at 854.  That concern isn't present here, at least not at this stage of the litigation.

The court denies defendants Moore and Gray's Motion to Dismiss plaintiffs' claims for negligent supervision of children against them under Count IX.

### 6. Whether the Court Lacks Subject Matter Jurisdiction over Plaintiffs' Claims for Outrage (Count XII)

The parties dispute whether the court has subject matter jurisdiction over the state law outrage claims given plaintiffs' failure to include outrage among the claims they listed in their Notice of Claims letter under Kan. Stat. Ann. § 12-105b(d) (Doc. 97-2).  That statute requires a plaintiff with a tort claim against a municipality or a municipal employee to file a notice of claim

prior to filing a lawsuit.  *See* Kan. Stat. Ann. § 12-105b(d).  "This notice requirement is a condition precedent to suit against a municipality." *Cano v. Denning*, No. 12-2217-KHV, 2013 WL 322112, at *8 (D. Kan. Jan. 28, 2013).  A "municipality" includes any "school district or . . . any agency, authority, institution or other instrumentality thereof."  Kan. Stat. Ann. § 75-6102(b).  The court's jurisdiction depends on plaintiffs' compliance with § 12-105b(d)'s notice of claim requirements. *Myers v. Bd. of Jackson Cnty. Comm'rs*, 127 P.3d 319, 325 (Kan. 2006) ("If the statutory requirements are not met, the court cannot acquire jurisdiction over the municipality."); *see also Wanjiku v. Johnson Cnty., Kan.*, 173 F. Supp. 3d 1217, 1236–37 (D. Kan. 2016) (dismissing plaintiff's tort claims against county under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction due to plaintiff's failure to comply with Kan. Stat. Ann. § 12-105b(d)).

Defendants Moore and Gray argue that plaintiffs' failure to include the outrage claim in the Notice of Claims letter left them no opportunity to investigate that claim.  *See* Doc. 97 at 24. To support this argument, defendants point to our court's decision in *Lines v. City of Ottawa*, No. Civ.A. 02-2248-KHV, 2003 WL 21402582, at *10 (D. Kan. June 16, 2003).  *Lines* held that plaintiff had failed to comply with § 12-105b's requirements when his "notice of claim did not include a claim of wrongful termination in violation of public policy and therefore it did not afford the City the opportunity to investigate such a claim." *Lines*, 2003 WL 21402582, at *10. Defendants Moore and Gray argue that the statute seeks to guarantee potential defendants notice of the specific claims and opportunities to investigate the claim before being sued on that claim. Doc. 97 at 24 (citing *Shaffer v. City of Topeka*, 57 P.3d 35 (Kan. Ct. App. 2002)).

Plaintiffs respond that they've substantially complied with the statutory requirements and that defendants have failed to offer any authority showing why (1) plaintiffs needed to include

the outrage claim in their Notice of Claims letter, or (2) omission of the outrage claim would preclude substantial compliance with the statute.  Plaintiffs don't mention *Shaffer* or *Lines*—the two cases defendants Moore and Gray discuss to support their argument on this point.  Plaintiffs instead contend that their Notice of Claims letter satisfies the requirements for substantial compliance listed in the Kansas Supreme Court's decision in *Sleeth v. Sedan City Hospital*.  *See* Doc. 100 at 32 (quoting 317 P.3d 782, 892–93 (Kan. 2014)).

But *Sleeth* explains that compliance is "achieved when the notice advises the municipality of the time and place of the injury, affords the municipality an opportunity to ascertain the character and extent of the injury sustained, and allows for the early investigation and resolution of claim disputes."  *Id.* at 791.  Failing to specify the claims hardly allows for investigation and resolution of claim disputes.  Our court reasoned similarly in past cases.  *See, e.g.*, *Lines*, 2003 WL 21402582, at *10 (The "notice of claim did not include a claim of wrongful termination in violation of public policy and therefore it did not afford the City the opportunity to investigate such a claim.  The notice does not comply with [§ 12-105b].").

Here, plaintiffs' Notice of Claims letter didn't mention an outrage claim.  *See* Doc. 97-2 at 2–3.  The letter thus afforded defendants no opportunity to investigate or resolve that claim.  The omission bumps the notice out of alignment with § 12-105b.  Without the required notice, the court lacks subject matter jurisdiction over the claim.  The court thus grants defendants Moore and Gray's Motion to Dismiss the outrage claims against them in Count XII under Fed. R. Civ. P. 12(b)(1).  The court dismisses the claim without prejudice.  *See Wanjiku*, 173 F. Supp. 3d at 1237 (citing *Debbrecht v. City of Haysville, Kan.*, No. 10-CV-1419-JAR, 2012 WL 1080923, at *1 (D. Kan. Mar. 29, 2012) (confirming that a dismissal of state law claims for failure to comply with § 12-105b should be without prejudice)).

### D.      Recap of Rulings on Claims Against Defendants Moore and Gray

The court thus grants defendants Moore and Gray's Motion to Dismiss (Doc. 96) in part and denies it in part.  For defendant Moore, the court grants the Motion to Dismiss for the federal claims (Counts II, III, IV), and for the state law outrage claim (Count XII) and dismisses those claims accordingly.  The court dismisses Count XII without prejudice for lack of subject matter jurisdiction.  But the court denies the Motion to Dismiss for the remaining state law claims against defendant Moore (Counts VII, IX, X, XI, XIII).

For defendant Gray, the court grants the Motion to Dismiss for the federal danger creation claim under § 1983 (Count III) and the state law claims for battery, false imprisonment, negligent supervision of employees, and outrage (Counts VIII, X, XI, XII, XIII).  The court dismisses those claims against defendant Gray accordingly.  But the court denies the Motion to Dismiss for the federal claims for supervisory liability (Counts I and V) and the state law claim for negligent supervision of children (Count IX).

The court now turns to the two Motions for Summary Judgment.

## IV.    Motions for Summary Judgment (Doc. 94 & Doc. 101)

Two summary judgment motions are ripe for ruling.  *First*, the court considers defendant Creamer's Motion for Summary Judgment (Doc. 94).  And *second*, the court considers plaintiffs' summary judgment motion (Doc. 101).[9]  But before turning to either, the court recites the legal standard that governs these motions.

### A.      Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to judgment as a matter of law."

---

[9]      Plaintiffs style their filing as a "Partial Motion for Summary Judgment on Count XI:  Battery and Count XII:  Outrage/IIED against Defendant Creamer."  Doc. 101 at 1.

Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  When the court applies this standard, it views the evidence and draws inferences in the light most favorable to the non-moving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  An issue of "material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And, an issue of fact is "material" if it has the ability to "affect the outcome of the suit under the governing law[.]"  *Id.*

The party moving for summary judgment bears the initial burden of showing "the basis for its motion."  *Celotex Corp.*, 477 U.S. at 323; *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (explaining that the moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law'" (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  A summary judgment movant can satisfy this burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp.*, 477 U.S. at 325; *see also Kannady*, 590 F.3d at 1169 (explaining that, to meet its summary judgment burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim" (citation and internal quotation marks omitted)).

If the moving party satisfies its initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250 (citation and internal quotation marks omitted); *see also Kannady*, 590 F.3d at 1169 ("If the movant carries [the] initial burden, the nonmovant may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries

the burden of proof." (citation and internal quotation marks omitted)).  To satisfy this requirement, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Celotex Corp.*, 477 U.S. at 324 (citation and internal quotation marks omitted).  When deciding whether the parties have shouldered their summary judgment burdens, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.

Summary judgment is not a "disfavored procedural shortcut."  *Celotex Corp.*, 477 U.S. at 327.  Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Id.* (quoting Fed. R. Civ. P. 1).

### B.    Defendant Creamer's Motion for Summary Judgment (Doc. 94)[10]

Defendant Creamer asks the court to grant her "summary judgment as to all of Plaintiffs' claims under 42 U.S.C. § 1983 in the Third Amended Complaint."  Doc. 94 at 1.  The parties' briefing presents an initial question about whether the parties adequately complied with one of our court's local rules.  The court briefly addresses that question before reciting the uncontroverted facts relevant to defendant Creamer's arguments for summary judgment.

---

[10]     Plaintiffs invoke Fed. R. Civ. P. 56(d) to request that the court defer or deny defendant Creamer's Motion for Summary Judgment.  *See* Doc. 98 at 11–12.  Plaintiffs assert that the court should refuse summary judgment "'where the nonmoving party has not had the opportunity to discover information that is essential to his opposition.'"  *Id.* at 11 (quoting *Price v. W. Res., Inc.*, 232 F.3d 779, 783 (10th Cir. 2000)).  The decision to grant relief under Fed. R. Civ. P. 56(d) is within the court's discretion.  *Jensen v. Redevelopment Agency of Sandy City*, 998 F.2d 1550, 1554 (10th Cir. 1993).  Here, the court concludes that the sort of evidence that plaintiffs wish to discover, *see* Doc. 98 at 12–13 (citing Doc. 98-3); Doc. 98-3 (Curry Aff.), is not essential to plaintiffs' opposition given the existing summary judgment record and the nature of the issues the Motion for Summary Judgment presents.  The court thus denies plaintiffs' request under Fed. R. Civ. P. 56(d).

### 1. The Parties' Failure to Comply with D. Kan. Rule 56.1

In their briefing on the Motion for Summary Judgment (Doc. 94), both parties departed from our court's local rules governing motions for summary judgment. *See* D. Kan. Rule 56.1(a)–(c). Our local rules are more than mere suggestions, they "govern the procedure in all proceedings before this court." D. Kan. Rule 1.1(a).

The parties trailblazed their own approaches to summary judgment. Defendant Creamer asserts that her deviation from the rules is permissible because the "purpose and intent of D. Kan. Rule 56(a) has not been violated." Doc. 107 at 7. She explains that "the real intent of the rule . . . is to clearly establish which material facts are in dispute and which are not." *Id.* Defendant Creamer asserts that through her idiosyncratic method of setting out the facts, she "has done that[.]" *Id.*

But she has not done that. Though she's in good company. Neither party's factual presentation is a tidy one. And though the parties might have intended to simplify things by departing from the rules, their approach complicated the court's task.

In the end, neither party's departure from the local rules provides a proper basis for disposing of defendant Creamer's Motion for Summary Judgment. The court thus considers the uncontroverted facts as best it can discern them from the briefs and will accede to defendant Creamer's request that the court accept as true Luna and Ramey's versions of the incident "in lieu of Ms. Creamer's version." Doc. 95 at 9.

The court recites the uncontroverted material facts and then considers defendant Creamer's arguments for Summary Judgment against plaintiffs' claims.

## 2.  Uncontroverted Facts[11]

"Plaintiff Reed Saunders is incapacitated and suffers from several physical and mental disabilities."  Doc. 95 at 7 (SOUF ¶ 1) (citing Doc. 90 at 2 (Third Am. Compl.)); Doc. 98 at 6 (DSOF ¶ 7) (citing Doc. 98-1 (Saunders Decl.) ("Reed Saunders is blind and developmentally disabled and was confined to a wheelchair.")); *see also* Doc. 98-1 (Saunders Decl. ¶¶ 3–6) (attesting that Reed Saunders's disabilities render him blind, non-verbal, limited to minimal sign language, and the functioning of a 1-to-3 year-old and substantially limit him in all major life activities such that he relies on others at all times to perform his activities of daily living).

"In January 2019, Defendant Robin Creamer was employed by Defendant USD 353 (the Wellington School District) as a paraeducator."  Doc. 95 at 7 (SOUF ¶ 2) (citing Doc. 62-4 (Creamer Decl. ¶ 2)).  "On January 18, 2019, Defendant Brenda Gray (high school special education teacher), Defendant Tammy Moore (another paraeducator), and Ms. Creamer supervised some Wellington students [who] were transported to a basketball game hosted by a YMCA in Wichita, Kansas."  *Id.* (SOUF ¶ 3) (citing Doc. 62-4 (Creamer Decl. ¶ 3)).  "Plaintiff Reed Saunders was attending Wellington High School at the time and was one of the students who went to the game."  *Id.* (SOUF ¶ 4) (citing Doc. 62-4 (Creamer Decl. ¶ 4)).  "Reed was strapped into a wheelchair on the sidelines[.]"  *Id.* (SOUF ¶ 5) (citing Doc. 62-4 (Creamer Decl. ¶ 5)); Doc. 98 at 6 (DSOF ¶ 5).  "There was a woman beside him, his para[educator].  During the whole game she looked angry and like she did not want to be there."  Doc. 73-2 at 1 (Ramey Decl. ¶ 5);[12] *see also* Doc. 95 at 12 (citing Doc. 73-2 at 1 (Ramey Decl.)).

---

[11]    At the summary judgment stage, the court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Scott*, 550 U.S. at 378.

[12]    Defendant Creamer suggests that she was the woman described.  Doc. 95 at 12.

Defendant Creamer "slapped his hand[.]" Doc. 95 at 8 (SOUF ¶ 7) (citing Doc. 62-4 (Creamer Decl. ¶ 7)); Doc. 98 at 6 (DSOF ¶ 7). Defendant "Creamer grabbed his arms and pulled them down[.]" Doc. 95 at 8 (SOUF ¶ 8) (citing Doc. 62-4 (Creamer Decl. ¶ 8)); Doc. 98 at 6 (DSOF ¶ 8). She "clamp[ed] his arms hard down to his wheelchair. It was shocking. She looked angry." Doc. 73-2 at 1 (Ramey Decl. ¶ 6); *see also* Doc. 95 at 12 (citing Doc. 73-2 at 1 (Ramey Decl.)).

"After Reed became agitated, Ms. Moore did see Ms. Creamer become 'worked up,' got down in his face, and yell: 'Reed, don't you do that!'" Doc. 95 at 10 (citing Doc. 62-3 (WPD Recorded Interview of Tammy Moore)). Creamer had moved closer to Reed Saunders's face and "told him in a raised voice something to the effect of 'don't hit me'" and "also probably said 'don't make me mad.'" Doc. 95 at 8 (SOUF ¶ 10) (citing Doc. 62-4 (Creamer Decl. ¶ 10)); Doc. 98 at 7 (DSOF ¶ 10). One witness heard defendant Creamer "yell, in an angry tone" at Reed Saunders: "'NO! Do not hit me! You know you don't want to make me mad!'" Doc. 73-4 at 2 (Luna Decl. ¶ 7); *see also* Doc. 95 at 12 (quoting Doc. 73-4 at 2 (Luna Decl.)). A teacher from another school intervened. Doc. 73-4 at 2 (Luna Decl. ¶ 8); *see also* Doc. 95 at 12 (citing Doc. 73-4 at 1–2 (Luna Decl.)). The teacher intervened by rubbing Reed Saunders's back and reassuring him that he was okay. *Id.*; *see also* Doc. 95 at 12 (citing Doc. 73-4 at 1–2 (Luna Decl.)). The boy "smiled and raised his hand . . . Creamer then aggressively pushed his hand down and again yelled at him." *Id.* (Luna Decl. ¶ 9); *see also* Doc. 95 at 12 (quoting Doc. 73-4 at 1–2 (Luna Decl.)).

"At some point, Tammy Moore and Ms. Creamer were able to transfer Reed from his wheelchair to stand with a walker." Doc. 95 at 8 (SOUF ¶ 11) (citing Doc. 62-4 (Creamer Decl. ¶ 11)); Doc. 98 at 7 (DSOF ¶ 11). They "rush[ed] the boy out of his wheelchair." Doc. 73-2 at 1

(Ramey Decl. ¶ 7).  Defendants Moore and Creamer and Reed Saunders, in his walker, traveled to the bathroom.  Doc. 95 at 8 (SOUF ¶¶ 12–13) (citing Doc. 62-4 (Creamer Decl. ¶¶ 12, 14)); Doc. 98 at 7 (DSOF ¶¶ 12, 14).  "They started grabbing the front of his walker, holding his arm down, and yanking him along, like they were trying to make the boy run."  Doc. 73-2 at 1 (Ramey Decl. ¶ 7); *see also* Doc. 95 at 12 (quoting Doc. 73-2 at 1 (Ramey Decl.)).  As defendant Creamer escorted Reed Saunders from the gymnasium, she smacked the boy's arm.  Doc. 73-4 at 1 (Luna Decl. ¶ 6); *see also* Doc. 95 at 12 (quoting Doc. 73-4 at 1–2 (Luna Decl.)).

"Later, on February 8, 2019, Ms. Creamer was interviewed by . . . the Wichita Police Department regarding the basketball game incident."  Doc. 95 at 9 (SOUF ¶ 17) (citing Doc. 62-4 (Creamer Decl. ¶ 17)); Doc. 98 at 8 (DSOF ¶ 17).  Defendant Creamer "admitted that she was wrong in slapping Reed's hand."  *Id.* (SOUF ¶ 18) (citing Doc. 62-4 (Creamer Decl. ¶ 18)); Doc. 98 at 8 (DSOF ¶ 18).  Defendant Creamer "was then (and still is now) remorseful for her conduct during th[e] incident."  *Id.* (SOUF ¶ 18) (citing Doc. 62-4 (Creamer Decl. ¶ 18)); Doc. 98 at 8 (DSOF ¶ 18).  "The Wichita Police Department conducted an investigation of the basketball game incident after a former Wellington teacher, Angela Luna, complained by email to Defendant USD 353, and Plaintiff P.J. Saunders reported the incident to the Wichita Police Department."  *Id.* (SOUF ¶ 19) (citing Doc. 62-5 (WPD Subpoenaed Records, Bates Nos. 20003, 20007, 20018)).  A witness (Luna) described the incident this way:

> Yesterday during the Tri-County basketball games, I witnessed a para taking Reed out of the gym she smacked his arm and yelled at him.  She yelled "NO!, Do not hit him!  You know you don't want to make me mad!"  She kept this angry tone with him until I went up to him rubbed his back and softly told him he was okay. He then smiled and just raised his hand when she over reacted again and aggressively pushed his hand down and yelled at him again.  I told her he was fine and wasn't going to hurt me and I continued to reassure Reed.

*Id.* (SOUF ¶ 20) (citing Doc. 62-5 (WPD Subpoenaed Records, Bates Nos. 20016-20017)); Doc. 98 at 8–9 (DSOF ¶ 20).  "P.J. Saunders was interviewed [by the Wichita Police Department] but she had not attended the game and had not seen the incident."  Doc. 95 at 10 (SOUF ¶ 22) (citing Doc. 62-5 (WPD Subpoenaed Records, Bates Nos. 20003, 20007)).  "On February 8, 2019, Detective Steven K. Meyer of the Wichita Police Department interviewed Defendant Creamer and Defendant Moore separately regarding the basketball game incident.  Those interviews were recorded."  Doc. 95 at 10 (SOUF ¶ 23) (first citing Doc. 62-2 (WPD Recorded Interview of Robin Creamer); then citing Doc. 62-3 (WPD Recorded Interview of Tammy Moore)). Defendant Moore "told Detective Meyer that she saw Ms. Creamer grab Reed's hands (while they were over his head) and 'yank' his arms down to his sides."  Doc. 95 at 10 (SOUF ¶ 26) (citing Doc. 62-3 (WPD Recorded Interview of Tammy Moore)).

"On April 17, 2019, Defendant Creamer was charged in Sedgwick County District Court (Case No. 2019CR1012) with misdemeanor battery for causing 'physical contact with another person, to wit:  RSS, done in a rude, insulting or angry manner' in violation of K.S.A. 2018 Supp. 21-5413(a)(2)."  Doc. 95 at 11 (SOUF ¶ 30) (citing Doc. 62-4 (Creamer Decl. ¶ 19)). Defendant "Creamer pled guilty to the misdemeanor charge on August 23, 2019[.]"  Doc. 95 at 11 (SOUF ¶ 31) (citing Doc. 62-4 (Creamer Decl. ¶ 20)).

### 3.  Discussion

Plaintiffs bring federal claims against defendant Creamer under 42 U.S.C. § 1983.  *See* Doc. 90 (Counts II, III, IV).  To support her Motion for Summary Judgment against those claims, defendant Creamer invokes the doctrine of qualified immunity.  Doc. 95 at 6.  The court already discussed qualified immunity at length when considering defendants Moore and Gray's Motion to Dismiss (Doc. 96).  *See supra* pp. 32–34.  As a refresher, the "doctrine of qualified immunity

protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson*, 555 U.S. at 231 (quoting *Harlow*, 457 U.S. at 818).  To establish a claim under 42 U.S.C. § 1983 against an individual defendant who asserts the defense of qualified immunity, plaintiff must (1) come forward with facts that "make out a violation of a constitutional right[,]" and (2) demonstrate that "the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  *Id.* at 232 (citing *Saucier*, 533 U.S. at 201).

> **a. Whether Qualified Immunity Entitles Defendant Creamer to Summary Judgment Against Plaintiffs' Substantive Due Process Claim Under § 1983 (Count II)**
>
> **i. Whether Qualified Immunity Entitles Defendant Creamer to Summary Judgment Against Plaintiffs' Substantive Due Process Claim Under the Fourth Amendment**

Defendant Creamer invokes qualified immunity as a defense to plaintiffs' substantive due process claim based on Reed Saunders's Fourth Amendment rights.  Doc. 95 at 16–18.  Plaintiffs respond that defendant Creamer does not enjoy qualified immunity because her conduct violated Reed Saunders's clearly established rights under the Fourth Amendment.  Doc. 98 at 21–24, 28, 30–31.

To support this argument against qualified immunity, plaintiffs cite two Tenth Circuit cases:  *Couture*, 535 F.3d at 1243, and *Ebonie S.*, 695 F.3d at 1051.  Doc. 98 at 22, 30–31.  The court already discussed these two cases and the limits of their support for plaintiffs' arguments that case law *clearly established* the contours of Reed's constitutional rights under the Fourth Amendment.  *See supra* pp. 36–37.  The Memorandum and Order's earlier analysis does not necessarily answer the question here—after all, the court must consider the specific context of defendant Creamer's conduct under the summary judgment facts, not the Motion to Dismiss

facts. *White*, 137 S. Ct. at 552; *Mullenix*, 577 U.S. at 12 ("This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." (citation and internal quotation marks omitted)). But the differences in the particularized facts of the various employee defendants' conduct here do not yield different outcomes. The court's analysis and conclusion here nonetheless turn out the same as above.

As the court explained when ruling the Motions to Dismiss, *see, e.g.*, *supra* pp. 36–37, neither *Couture* nor *Ebonie S.* held that the defendant's conduct constituted a "seizure" for purposes of the Fourth Amendment. *Couture* clarified little about what constitutes a Fourth Amendment seizure. Contrary to plaintiffs' characterization of *Couture*'s holding, *see* Doc. 98 at 22 n.7 (suggesting that in "*Couture*, the Tenth Circuit held that placing a young student repeatedly in a time-out room did qualify as a seizure . . . ."), the Tenth Circuit merely *assumed* that defendants' conduct qualified as a seizure so the Circuit could proceed to the apparently easier Fourth Amendment inquiry question—whether that conduct was unreasonable. *See Couture*, 535 F.3d at 1251 (explaining that the Tenth Circuit "need not resolve this issue because, even assuming the timeouts were seizures, they were not unreasonable").

And *Ebonie S.* explicitly held that the conduct at issue fell short of a Fourth Amendment seizure. *See Ebonie S.*, 695 F.3d at 1057. The Tenth Circuit named several factors that precluded deeming the conduct a "seizure" and noted that if "one or more of these facts were absent," the court's "conclusion *might* be different." *Id.* (emphasis added). Some of those precluding factors indeed are absent from plaintiffs' allegations here. But *Ebonie S.* only noted that it might hold differently under different facts. *Ebonie S.*, 695 F.3d at 1057. As the court explained earlier, the court discerns no "clearly established right" from a hesitant remark that hardly "placed the . . . constitutional question beyond debate." *White*, 137 S. Ct. at 551.

The court struggles to view these two cases as having clearly established Reed Saunders's rights under the Fourth Amendment.  Neither case concluded that the conduct at issue was unreasonable for purposes of the Fourth Amendment.  *Ebonie S.* didn't even reach the question.  *See Ebonie S.*, 695 F.3d at 1057 (affirming district court's grant of summary judgment on Fourth Amendment claim because plaintiff "was not seized within the meaning of the Fourth Amendment").  And *Couture* held that defendants' conduct was not unreasonable, and thus could not violate the Fourth Amendment even if the conduct qualified as a "seizure."  *Couture*, 535 F.3d at 1251.  Again, the allegations here differ from the facts of *Couture* in various respects, but those differences are not sufficient to support a conclusion under *Couture* that the clearly established law had placed a reasonable person in defendant Creamer's position on notice that her conduct violated Reed Saunders's Fourth Amendment rights.

Plaintiffs fail to discharge their burden to show that defendant Creamer violated Reed Saunders's clearly established substantive due process rights under the Fourth Amendment.  The court thus turns to plaintiffs' second supposed avenue for a possible substantive due process violation:  The Fourteenth Amendment.

### ii.  Whether Qualified Immunity Entitles Defendant Creamer to Summary Judgment Against Plaintiffs' Substantive Due Process Claim Under the Fourteenth Amendment

In Count II, plaintiffs bring a claim against defendant Creamer under § 1983 for violating Reed Saunders's Fourteenth Amendment right to substantive due process.  To support her Motion for Summary Judgment against that claim, defendant Creamer invokes qualified immunity.  Doc. 95 at 11, 13–24.  She argues that (1) her conduct was not unconstitutional, and (2) even if it was, her conduct was not a "clearly established" Fourteenth Amendment violation.

Plaintiffs object to both arguments.  Doc. 98 at 14.  They respond that (1) defendant Creamer's conduct shocks the conscience for purposes of the Fourteenth Amendment, *see id.* at 20–21, and (2) defendant Creamer was on notice that her conduct would violate Reed Saunders's constitutional rights, *see id.* at 28–29.

Below, the court addresses each of these two prongs of qualified immunity.  The court begins by considering whether defendant Creamer violated Reed Saunders's Fourteenth Amendment rights.

### A.      Whether defendant Creamer Violated Reed Saunders's Substantive Due Process Right Under the Fourteenth Amendment

The parties agree that the doctrine for Fourteenth Amendment substantive due process claims based on uses of force on school children is the "shocking to the conscience" standard. *See* Doc. 95 at 18–20; Doc. 98 at 14–15.  During the above analysis of related issues that the motions to dismiss presented, *see supra* pp. 38–43, 50–54, the court discussed this standard and various Tenth Circuit cases applying it—including cases that plaintiffs and defendant Creamer discuss and distinguish in their briefs, *see* Doc. 107 at 15–16 (discussing *Muskrat*, *Holloman*, and *Harris*).

As a reminder, "at some point, excessive corporal punishment violates [a student's] substantive due process rights."  *Garcia*, 817 F.2d at 653.  The Tenth Circuit has explained that "the substantive due process inquiry in school corporal punishment cases must be whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience."  *Id.* at 655 (citation and internal quotation marks omitted).

When ruling on defendant USD 353's Motion to Dismiss (Doc. 92), the court considered whether plaintiffs had alleged a *subordinate violation* for purposes of the school district's supervisory liability under § 1983. *See supra* pp. 50–54. The court applied the "shocking to the conscience" standard to USD employee defendant Creamer's conduct. The court reviewed *Muskrat*, *Couture*, and *Holloman*. In light of those cases' analyses and holdings, the court then considered defendant Creamer's alleged conduct. The court reasoned that the allegations about defendant Creamer's conduct and Reed Saunders's extraordinary state of vulnerability together alleged a use of force that a reasonable trier of fact could find was grotesquely disproportionate to the need presented and emitted indicia of malicious inspiration. The court found the alleged conduct to be conscience shocking for purposes of the substantive due process inquiry, and thus concluded that plaintiffs alleged a subordinate violation as necessary for the supervisory liability claim against the school district.

Defendant Creamer's Motion for Summary Judgment now reveals a very similar question. But the analysis is not quite the same as above. The factual universe in which this Motion for Summary Judgment nests differs from the facts governing the Motion to Dismiss. *Compare* Fed. R. Civ. P. 56, *with* Fed. R. Civ. P. 12(b)(6). So, while the court found defendant Creamer's conduct alleged in the Third Amended Complaint could satisfy the shock the conscience standard, the court now must evaluate defendant Creamer's conduct as the uncontroverted facts describe it.

The slightly different fact-set that governs here does not alter the outcome, or the court's application of our Circuit's substantive due process case law to defendant Creamer's conduct (which lacks any of the relative "tameness" that the court had assigned to defendant Moore's). None of the Fourteenth Amendment cases that the court has discussed thus far, *see, e.g., supra*

38–43, 50–54, precludes a reasonable fact finder from concluding from the uncontroverted facts that defendant Creamer's conduct rises to the level of a substantive due process violation.

In her reply brief, defendant Moore introduces another case: *Williams v. Berney*, 519 F.3d 1216 (10th Cir. 2008). Doc. 107 at 10. She asserts that *Williams*'s analysis and holding control this case. *Id.* at 11–12. She explains that *Williams* held that the government employee/defendant in *Williams* "had no authority to use any force with respect to the plaintiffs" and "did not abuse his official position . . . to further his unprovoked attack . . . ." *Id.* at 12 (citing *Williams*, 519 F.3d at 1224–25).

Here, defendant Creamer's situation differs. The uncontroverted facts show that defendant Creamer was Reed Saunders's para-educator and that he was entirely reliant on her (among others) to do things as simple as moving. The uncontroverted facts here could support a finding or inference by a reasonable fact finder that, unlike *Williams*, the government employee/defendant here had authority to use some kind of force against plaintiff Reed Saunders and that defendant Creamer abused her official position to further her attack on the student. The court thus does not find *Williams* to apply cleanly here. *Williams* does not rule out a substantive due process violation under the uncontroverted facts here.

These uncontroverted facts viewed in plaintiffs' favor show that defendant Creamer angrily and repeatedly slapped, smacked, yanked, pushed, yelled in the face of, and threatened a student. Some of the conduct—yelling, aggressive pushing, sign-language silencing, yanking, and smacking—occurred even after someone intervened to deescalate the situation and console the boy. This mistreatment of any student, if true, would be troubling.

But things look far worse after one evaluates defendant Creamer's conduct in context. The calculation of the brutality and inhumanity of defendant Creamer's actions may change

dramatically after a reasonable fact finder considers the particulars of the student who found himself on the business end of her abuse. Defendant Creamer mistreated a student whose physical and mental disabilities render him *superlatively vulnerable*. The student is blind, non-verbal, incapacitated, spinally compromised, was strapped into a wheelchair for much of the incident, and has the mental capacity of one-to-three year-old. Some of defendant Creamer's repeated pushing, yanking, and pulling of Reed Saunders prevented the non-verbal boy from using his arms for sign language. The student had red welts on his arm and hand after the incident. Doc. 73-1 at 1 (Saunders Decl. ¶ 9); *see also* Doc. 95 at 13 (quoting Doc. 73-1 at 1 (Saunders Decl.)).

Is this conduct conscience shocking under Fourteenth Amendment substantive due process doctrine? Defendant Creamer argues it's not. She reasons that conduct that shocks the conscience must leave the victim with severe injuries, and that Reed Saunders sustained no significant injuries. Doc. 95 at 21–23; Doc. 107 at 8–9 (comparing the facts here to *Harris* and *Gerks*). She argues that the "incident at issue does not rise to the level of egregious misconduct causing serious injury for which the Tenth Circuit has found a constitutional violation." *Id.* at 9 (citing *generally*, *Harris*, 372 F.3d 927). And she analogizes the tormenting of Reed Saunders to the conduct in *Muskrat* and *Abeyta By & Through Martinez v. Chama Valley Indep. Sch. Dist., No. 19*, 77 F.3d 1253 (10th Cir. 1996). *Abeyta* held that a teacher's repeated public name-calling of a student—referring to a 12-year-old as a prostitute—did not rise to the level of a substantive due process violation. *Abeyta*, 77 F.3d at 1257–58.

The nub of defendant Creamer's argument is that the "injury" factor that *Garcia* articulated (and *Harris* quoted) precludes the court from adorning her conduct with the conscience shocking label required for a substantive due process violation. Doc. 107 at 8–9, 16;

Doc. 95 at 21–23 (suggesting that Tenth Circuit case law requires "severe injury" or "significant physical or psychological injury to the student" for an abuse of official power to be shocking to the conscience and distinguishing cases on that basis). She suggests that for "a substantive due process claim to be viable, there must be significant physical or psychological injury to the student and egregious facts." *See* Doc. 107 at 16 (citing *Holloman*). Defendant Creamer asserts that the facts here don't show that Reed Saunders sustained a significant injury. *See id.* So, she reasons, the conduct cannot shock the conscience as needed to rise to a substantive due process violation. *See id.*

The court is unpersuaded. Defendant Creamer's argument reads our Circuit's cases too casually. "In school discipline cases, the substantive due process inquiry is 'whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.'" *See Harris*, 273 F.3d at 930 (quoting *Garcia*, 817 F.2d at 655).

Defendant Creamer's reasoning overlooks the difference between (1) a "severe injury" and (2) an "injury so severe . . . that it amounted to . . . ." *See* Doc. 95 at 23 (suggesting that *Garcia* requires "severe injury" for an abuse of official power to be shocking to the conscience). By conflating those ideas, defendant Creamer misreads *Garcia* as measuring the severity of injury in terms of *degree of harm*. But *Garcia* measures an injury's severity (along with the other two factors) in terms of *brutality and inhumanity*. *See Harris*, 273 F.3d at 930 (explaining that Garcia "noted 'that at some point of excessiveness or brutality, a public school child's substantive due process rights are violated by beatings administered by government paid school officials'" (quoting *Garcia*, 817 F.2d at 655)). Of course, the degree of harm that a defendant's

use of force produces often might correlate with how brutal and inhumane that force is. And some of the case law reflects that correlation. But strictly speaking, they're not substitutes for one another.

The error that conflating the two produces becomes clear when one places the "injury so severe . . ." language back in its proper context. The "injury so severe" factor is just one of three factors that the court weighs to determine the brutality and inhumanity of the "force applied." *Garcia* asks whether the applied force's (1) resulting injury, (2) disproportionality to the need presented, and (3) malicious or sadistic inspiration were *enough* to amount to a brutal and inhumane abuse of official power. *See Harris*, 273 F.3d at 930 (quoting *Garcia*, 817 F.2d at 655). To both (1) rip the "injury so severe" factor from its multifactorial context and (2) transmute it into a "severe injury" requirement is to impose a rule that differs materially from what our Circuit's cases actually hold. The court declines to follow defendant Creamer down that path.

The "substantive due process inquiry is 'whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.'" *See Harris*, 273 F.3d at 930 (quoting *Garcia*, 817 F.2d at 655). All three factors, to some extent, are present in the uncontroverted facts here. The court now identifies some of the areas of the summary judgment record where these factors present themselves, and then proceeds to answer the dispositive question—whether the extent of their presence is sufficient for a reasonable fact finder to conclude that the force applied was a brutal and inhumane abuse of official power literally shocking to the conscience.

*First*, the uncontroverted facts here allow for a reasonable fact finder to conclude that defendant Creamer's uses of force produced an injury. The uncontroverted facts show that Reed Saunders's parent discovered red welts on his arm and hand after the incident. Doc. 73-1 at 1 (Saunders Decl. ¶ 9); *see also* Doc. 95 at 13 (quoting Doc. 73-1 at 1 (Saunders Decl.)).[13]

*Second*, the uncontroverted facts about Reed Saunders's remarkably vulnerable state of physical and mental disability allow for a reasonable fact finder to conclude that defendant Creamer's uses of force were disproportionate to the need presented. Doc. 95 at 7 (SOUF ¶ 1); Doc. 98 at 6 (DSOF ¶ 7) (citing Doc. 98-1 (Saunders Decl.)); *see also* Doc. 98-1 at 2 (Saunders Decl. ¶¶ 3–6). As the court concluded above when ruling the motions to dismiss, *see supra* pp. 53–54, slapping, yanking, aggressive pushing, and smacking a blind, disabled person confined to

---

[13]    The summary judgment record might also include evidence from which a reasonable fact finder could conclude that Reed Saunders sustained a psychological injury. Defendant Creamer explains that her Motion for Summary Judgment "explicitly adopted Plaintiffs' version of the material facts based on the same declarations of Plaintiffs' witnesses Luna, Ramey, and PJ Saunders." Doc. 107 at 3 (citing Doc. 95 at 11–13); *see also* Doc. 95 at 11 (inviting the court to analyze the issues while "accepting the declarations of Ms. Luna and Ms. Ramey as true for purposes of this dispositive motion only"); Doc. 95 at 11 (asserting that "[n]o genuine issue of material fact is created with respect to Defendant Creamer's defense of qualified immunity if the Court assumes (as this Defendant requests) that Ms. Luna's and Ms. Ramey's versions of the incident are accepted as fact in lieu of Ms. Creamer's version").

Both parties repeatedly cite the Luna Declaration *generally* in their attempts to establish the uncontroverted facts. *See* Doc. 95; Doc. 98 (citing "Ex. 4"); Doc. 107. The court already explained that this habit departed from D. Kan. Rule 56.1's requirements that parties "refer with particularity to those portions of the record upon which [the party] relies." If the court considers these facts from the Luna Declaration—an exhibit that both parties directed the court to in general terms and from which defendant Creamer "explicitly adopted" material facts for purposes of the Motion for Summary Judgment—as part of the uncontroverted facts, then a reasonable trier of fact could find that Reed Saunders sustained both physical and psychological injuries. Luna attests that she currently works with Reed Saunders and that she has "noticed an improvement in [his] behavior this school year, as he is no longer afraid of school. He now has a good time and enjoys it." Doc. 73-4 at 3–4 (Luna Decl. ¶¶ 17, 19). From these facts, a reasonable fact finder could conclude that school employee/defendant Creamer's uses of force on Reed Saunders at a school event left him with a psychological injury causing him to fear school.

Fortunately, the court need not wade further through the fallout of the puzzling briefing styles. Given the uncontroverted presence of physical injury, and the other uncontroverted facts about disproportionality and malicious or sadistic inspiration, a finding of the psychological injury is *not* necessary to support the court's conclusion that the alleged conduct qualifies as brutal and inhumane under *Garcia*, and rises to a substantive due process violation.

a wheelchair—who poses no provocation or threat, cannot know why he's being hit, and lacks the physical ability to see it coming, call for help, flee, or protect himself—reflects a disproportionality relative to the need presented that is simply chasmic.

And *third*, the uncontroverted facts here allow a reasonable fact finder to conclude that the uses of force were inspired by malice or sadism rather than a merely careless or unwise excess of zeal. Defendant Creamer looked angry and worked up, Doc. 95 at 10 (citing Doc. 62-3 (WPD Recorded Interview of Tammy Moore)); Doc. 73-2 at 1 (Ramey Decl. ¶ 6), yelled in the boy's face, shouted threats, and even after the third party intervention yelled again, aggressively pushed his arms, yanked him along in his walker, and smacked the boy, Doc. 73-4 at 1–2 (Luna Decl. ¶¶ 6–7, 9); Doc. 95 at 8 (SOUF ¶ 10) (citing Doc. 62-4 (Creamer Decl. ¶ 10)); Doc. 98 at 7 (DSOF ¶ 10); Doc. 73-2 at 1 (Ramey Decl. ¶ 7). The conduct was not a single bad act stemming from a thoughtless reaction or momentary lapse of judgment. Instead it a was three-act show punctuated by both (1) a third party intervening and (2) the time it took to transfer Reed Saunders from his wheelchair to his walker.

Given Reed Saunders's obvious vulnerability, a trier of fact could find this conduct excessively cruel. The incident may lack the gore of *Garcia*, but the degree of brutality and inhumanity make up for it. A reasonable trier of fact could conclude from the uncontroverted facts that these three factors are evident in defendant Creamer's mistreatment of Reed Saunders in sufficient degree or amplitude to amount to a brutal and inhumane abuse of official power literally shocking to the conscience. Plaintiffs thus carry their burden for the first prong of qualified immunity analysis. The court now turns to the second prong and asks whether defendant Creamer's conduct violated Reed Saunders's *clearly established* Fourteenth Amendment right to substantive due process.

**B.      Whether Reed Saunders's Substantive Due Process Right was "Clearly Established"**

Defendant Creamer asserts that even if plaintiffs come forward with facts that make out a substantive due process violation, she remains entitled to qualified immunity because that right was not clearly established when she slapped Reed Saunders.  Naturally, plaintiffs disagree.

As the court has explained, a right is clearly established when "'there [is] a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts . . . found the law to be as the plaintiff maintains.'"  *Brown*, 662 F.3d at 1164 (quoting *Stearns*, 615 F.3d at 1282).  The court must determine "'whether the violative nature of *particular* conduct is clearly established.'"  *Ziglar*, 137 S. Ct. at 1866 (quoting *Mullenix*, 577 U.S. at 12).  But for qualified immunity to apply, the Supreme Court does not require a "reported case directly on point."  *Id.* at 1867 (citation and internal quotation marks omitted).  Instead, the Supreme Court's case law requires district courts to evaluate whether "the unlawfulness of the officer's conduct '[is] apparent'" "'in the light of pre-existing law.'"  *Id.* (quoting *Anderson*, 483 U.S. at 640).  The court "determine[s] whether the right was so clearly established that a reasonable person would have known that her conduct violated that right."  *Harris*, 273 F.3d at 931.

More than three decades ago, the Tenth Circuit put public school officials on notice "that at some point of excessiveness or brutality, a public school child's substantive due process rights are violated by beatings administered by government-paid school officials."  *Garcia*, 817 F.2d at 655.  Since *Garcia*, our Circuit has provided more specificity about where on the spectrum of conduct that "point of excessiveness or brutality" lays.  *Id.*  This Memorandum and Order already has explored, at length, much of the post-*Garcia* case law.

One case worth revisiting is *Muskrat v. Deer Creek Public Schools*, 715 F.3d 775 (10th Cir. 2013).  As the court previously explained, *Muskrat* involved a school official's use of force on a disabled child who, during the relevant time period, "was between five and ten years old but had the mental age of a two- or three-year-old," and "had impaired gross and fine motor skills, as well as balance problems and a pattern of seizures."  *Muskrat*, 715 F.3d at 780.  Given the *Muskrat* student's disabilities, the case bears a resemblance to Reed Saunders's case.  The court already distinguished the two, in part based on the extent of the students' respective disabilities. *See supra* pp. 52–53 (noting that unlike the *Muskrat* student, Reed Saunders is blind, non-verbal, and unable to walk or ambulate without mechanical and human assistance).  In short, Reed Saunders faced more substantial limitations.

*Muskrat* held that two uses of force on a disabled student failed to rise to the level of a substantive due process violation.  *First*, the Circuit held that "a rather mild slap" or "pop" to the student's cheek was not unconstitutional because the force lacked any "evidence that it was a 'brutal and inhumane abuse of official power.'"  *Muskrat*, 715 F.3d at 787 (quoting *Garcia*, 817 F.2d at 655).  And *second*, the Circuit held that a slap on the student's arm was not unconstitutional because the slap lacked any lasting harm or evidence of malice.  *Id.*

Plaintiffs point out that since the Tenth Circuit decided *Muskrat*, our Circuit faced a question similar to the question now before the court:  whether a student's substantive due process right was "clearly established" for purposes of qualified immunity when a teacher attacked him.  Doc. 98 at 29 (citing *Scott v. Mid-Del Schs. Bd. of Educ.*, 724 F. App'x 650 (10th Cir. 2018)).  In *Scott*, the Tenth Circuit reversed a district court's dismissal of a student's substantive due process claim against a teacher on qualified immunity grounds.  *Scott*, 724 F.

App'x at 657.[14]  Our Circuit held that the conduct sufficiently resembled *Garcia* such that a reasonable official in the teacher's position would have known that his actions violated the student's clearly established right.  *Id.* at 655.  *Scott* emphasized that the teacher (1) caused "numerous physical injuries" to the student by forcibly opening a bathroom stall door such that the door hit the student and the door pushed him backwards into the toilet, and (2) blocked the student where he was and "cursed and bullied him while he was in the vulnerable position of having his pants down" in the bathroom.  *Id.*  The Circuit emphasized that it was no matter that *Scott*'s facts were not identical to those in *Garcia* (a case involving paddling of a student) because the courts "'allow some degree of generality factual correspondence.'"  *Id.* (quoting *Armijo ex rel. Chavez v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1260 (10th Cir. 1998)).

The links to *Garcia* that *Scott* deemed sufficient also present themselves here to some degree.  Like both of those cases involving a school employee's use of force on a student, plaintiffs allege that defendant Creamer's uses of force caused numerous physical injuries to student Reed Saunders.  Doc. 73-1 at 1 (Saunders Decl. ¶ 9); *see also* Doc. 95 at 13 (quoting Doc. 73-1 at 1 (Saunders Decl.)).  And defendant Creamer struck, yelled at, and threatened Reed Saunders while he was in a "vulnerable position" and unable to escape.  *Scott*, 724 F. App'x at 655.

While plaintiffs have not produced a case factually identical to those facts present here, they identify cases that bear a resemblance to defendant Creamer's conduct.  The resemblance is close enough to have defined some of the contours of Reed Saunders's substantive due process

---

[14]     *Scott* is an unpublished case.  "'Although not dispositive . . . because of its unpublished status,'" the Tenth Circuit has a habit of noting that it has "'never held that a district court must ignore unpublished opinions in deciding whether the law is clearly established[.]'"  *Est. of Ceballos v. Husk*, 919 F.3d 1204, 1217 n.3 (10th Cir. 2019) (first quoting *Est. of Booker v. Gomez*, 745 F.3d 405, 428 n.29 (10th Cir. 2014); then quoting *Morris v. Noe*, 672 F.3d 1185, 1197 n.5 (10th Cir. 2012)).

rights.  Defendant Creamer's conduct—in its totality—fell plainly on the "conscience shocking" side of the line that our Circuit has drawn in cases like *Garcia*, *Harris* (distinguishing *Garcia* and *Gerks*), and *Scott*.  And the district court cases from our Circuit that defendant Creamer submits do not alter that assessment.  *See* Doc. 107 at 18 (first citing *E.C. v. U.S.D. 385 Andover*, No. 18-1106-EFM, 2019 WL 2073927, at *6–7 (D. Kan. May 10, 2019); then citing *Totty v. Indep. Sch. Dist. No. I-009 of Blaine Cnty. Okla.*, No. CV-08-572-F, 2010 WL 11606954, at *6–7 (W.D. Okla. Apr. 14, 2010); then citing *Gonzales v. Passino*, 222 F. Supp. 2d 1277, 1280–1282 (D.N.M. 2002)).  Each of these district court cases contains facts materially different from the circumstances here—and each lacks the degree of brutality and inhumanity present here.[15]

The contours of Reed Saunders's substantive due process rights were sufficiently definite in January 2019 to have placed a reasonable person in defendant Creamer's position on notice that her treatment of Reed Saunders would place her well within unconstitutional territory.  The case law did not leave uncertainty whether slapping, yelling in the face of, pulling or grabbing or yanking the arms of, threatening, forcing-to-run in his walker, and smacking a blind, fragile, non-verbal, wheelchair-and-walker-bound, disabled-to-the-point-of-incapacitated student without reason is the sort of thing that qualifies as deliberate and malicious conscience shocking conduct.  The court concludes that Reed Saunders's substantive due process right was so clearly

---

[15]    *See E.C.*, 2019 WL 2073927, at *1, 8 (involving student whose mental disability "manifests itself in aggressive, disruptive, disobedient, offensive, and sometimes violent, behavior" and evaluating school officials' use of force on the student "in response to his misconduct (destroying school property and punching Ms. Arndt in the face)"); *Totty*, 2010 WL 11606954, at *2, 9 (evaluating treatment of public school student with "health-related problems" including "obesity, attention deficit/hyperactivity disorder, 40% hearing loss and post traumatic stress disorder" and "encopresis, a condition which causes . . . difficulty in controlling . . . bowel movements" and holding that a school official grabbing the student arm(s) or also requiring the student "to sit for an afternoon in a cardboard box . . . and . . . to carry his chair outside and wait outside for his mother in the heat, rain and snow . . . did not result in a injury which rises to a level which shocks the court's conscience" ); *Gonzales*, 222 F. Supp. 2d at 1279–1281 (holding that teacher's uses of force on non-disabled student "because [the teacher] was angry at being called a [homophobic slur] or because [the student] was ignoring him and walking away" did not rise to the level of a substantive due process violation under the Fourteenth Amendment).

established under Tenth Circuit case law at the time of the gym incident that a reasonable person would have known that doing what defendant Creamer did to Reed Saunders violated that right.

The doctrine of qualified immunity "protects all but [1] the plainly incompetent or [2] those who knowingly violate the law." *Ziglar*, 137 S. Ct. at 1867 (citation and internal quotation marks omitted). Given the case law that plaintiffs have come forward with, the uncontroverted facts here show that on that date in January 2019, defendant Creamer was one, the other, and perhaps both. She is not entitled to qualified immunity.

### b. Whether Qualified Immunity Entitles Defendant Creamer to Summary Judgment Against Plaintiffs' Danger Creation Claim Under § 1983 (Count III)

In Count III, plaintiffs bring a claim against defendant Creamer for danger creation under § 1983. In support of her Motion for Summary Judgment against that claim, defendant Creamer asserts that she is entitled to qualified immunity. *See* Doc. 95 at 24–26. She argues that plaintiffs' Response to her motion fails to overcome either prong of the qualified immunity analysis for the danger creation claim. Doc. 107 at 21–23. The court agrees with her, in part. Plaintiffs fail to address adequately defendants' qualified immunity argument for this claim.

Plaintiffs assert that they adequately stated a claim for danger creation, Doc. 98 at 24–26, and the law was clearly established for purposes of qualified immunity, Doc. 98 at 28–29. But plaintiffs fail to persuade the court about the latter. Despite doing so in attempt to overcome qualified immunity for other claims, plaintiffs cite no cases and offer little explanation to support their assertion that clearly established law put defendant Creamer on notice that her conduct amounted to danger creation that violated Reed Saunders's constitutional rights. *See* Doc. 98 at 28–32.

Given the absence of meaningful analysis or arguments for this issue, plaintiffs have failed to discharge their burden to overcome defendant Creamer's qualified immunity defense for the danger creation claim.  The court thus grants defendant Creamer's Motion for Summary Judgment against the danger creation claim under Count III.

### c. Whether Qualified Immunity Entitles Defendant Creamer to Summary Judgment Against Plaintiffs' Claim that She Violated Reed Saunders's Fourteenth Amendment Right to Equal Protection (Count IV)

In Count IV, plaintiffs bring a claim against defendant Creamer under § 1983 for violating Reed Saunders's Fourteenth Amendment right to equal protection.  In support of her Motion for Summary Judgment against that claim, defendant Creamer invokes qualified immunity.  Doc. 95 at 27.  Plaintiffs' counterargument is essentially identical to the reasoning they raised against defendant Moore's assertion of qualified immunity for the equal protection claim.  *Compare* Doc. 98 at 31–32, *with* Doc. 100 at 24–25.  Both there and here, plaintiffs argue that the violative nature of each defendant's particular conduct was clearly established because a "general statement of law" applied with obvious clarity to the specific conduct in question.  *See* Doc. 98 at 31.  Plaintiffs explain that "the question to be answered is whether a general statement of law preexisted Creamer's conduct and applied with obvious clarity to singling out a non-verbal, immobile, developmentally disabled, blind child to maliciously strike him, shout at him, pin his arms and drag him into a bathroom."  *Id.*; *see also* Doc. 100 at 24.

For this general statement of law, plaintiffs point to the Tenth Circuit's articulation of a class-of-one claim in *Kansas Penn Gaming*.  Doc. 98 at 31–32.  In that case, our Circuit explained that a plaintiff has a class-of-one claim when "a public official, with no conceivable basis for his action other than spite or some other improper motive (improper because unrelated to his public duties), comes down hard on a hapless private citizen."  *Kan. Penn Gaming, LLC,*

656 F.3d at 1216 (citation and internal quotation marks omitted).  The "hapless" element reflects that the law requires similarly situated individuals, of which plaintiff is the unlucky one whom the public official "comes down hard on . . . ."  *See id.* ("To prevail on this [class-of-one] theory, a plaintiff must first establish that others, similarly situated in every material respect were treated differently." (citation and internal quotation marks omitted)); *see also id.* at 1217 (explaining that the Tenth Circuit has "recognized a substantial burden that plaintiffs demonstrate others similarly situated in all material respects were treated differently and that there is no objectively reasonable basis for the defendant's action." (citation and internal quotation marks omitted)).

The presence of similarly situated individuals influences how obviously a *general statement of law* about class-of-one claims applies to the conduct at issue.  *Syling* illustrates this. *Syling* held that the "clearly established rule prohibiting intentional, arbitrary and unequal treatment of similarly situated individuals under the law applie[d] with obvious clarity to Defendants' alleged actions and policy of discriminating . . . ."  *Syling*, 928 F.3d at 1198.  As the court explained above, *supra* pp. 44–49, the general rule of law in *Syling* included the phrase— "unequal treatment"—that produced a binary and straightforward analysis.  Given the alleged conduct at issue in *Syling*, treatment of similarly situated individuals (juvenile arrestees) was either equal or unequal.  The officials either did or did not disclose a given arrestees' personal information.  Given the simplicity of the conduct (information disclosure) and the presence of the similarly situated individuals (other juvenile arrestees), the general statement of law and the resulting analysis were "relatively straightforward and not difficult to apply."  *Id.* at 1199.

Earlier in this Memorandum and Order, the court concluded that plaintiffs failed to explain adequately or argue convincingly that *Engquist* and *Syling* mean that plaintiffs here overcome the clearly established prong of defendant Moore's qualified immunity defense for the

equal protection claim against her.  After considering arguments largely identical to those that plaintiffs raise here, the court reasoned that the unlawfulness of defendant Moore's alleged conduct does not follow immediately from the conclusion that the general rule—the one that plaintiffs quote from *Kansas Penn Gaming*—exists.  Here, the same is true for defendant Creamer's conduct.

The general statement of law that plaintiffs pull from *Kansas Penn Gaming* does not apply with obvious clarity to defendant Creamer's conduct.  In comparison to *Syling*, the language of the general statement of law is fuzzier, and the facts lack obviously similarly situated persons.  While other students also were present in the gymnasium, it's unclear whether they were situated similarly to Reed Saunders in every material respect.  While plaintiffs' preferred general statement of law might apply to defendant Creamer's alleged conduct, one cannot describe it as "apply[ing] with obvious clarity to the specific conduct in question."  *Syling*, 928 F.3d at 1198.

The court thus cannot conclude under *Syling* that the general rule plaintiffs pull from *Kansas Penn Gaming* is sufficiently specific to have put defendant Creamer on notice that she would violate Reed Saunders's equal protection right under the Fourteenth Amendment if she struck him, used her hands to press or clamp his arms down many times, transferred him from his wheelchair to his walker, and dragged him by his walker to the bathroom.  The general statement of law that plaintiffs identify is simply too general to define clearly established law here.

Plaintiffs thus fail to overcome the second prong of defendant Creamer's qualified immunity defense for the equal protection claim.  The doctrine of qualified immunity bars this

claim against her.  The court grants defendant Creamer's Motion to Dismiss the equal protection

claim against her under Count IV.

### 4. Summary of the Court's Rulings on Defendant Creamer's Motion for Summary Judgment

Defendant Creamer seeks summary judgment against all of plaintiffs' § 1983 claims.

Doc. 94 at 1.  The court grants that request in part and denies it in part.  The court grants

defendant Creamer's Motion for Summary Judgment against Count III (danger creation) and

Count IV (equal protection).  The court denies her request for summary judgment against Count

II's substantive due process claim under the Fourteenth Amendment.[16]

The court now turns to the lone motion remaining, plaintiffs' summary judgment motion

(Doc. 101).

### C. Plaintiffs' Summary Judgment Motion (Doc. 101)

Plaintiffs filed a motion styled as a "Partial Motion for Summary Judgment on Count XI:

Battery and Count XII:  Outrage/IIED against Defendant Creamer."  Doc. 101 at 1.  Defendant

Creamer filed a Response (Doc. 111).  So did defendant USD 353 (Doc. 110).  The court

recognizes the school district's motivations for filing the Response and considers both Responses

when ruling plaintiffs' summary judgment motion.

Plaintiffs initially asked the court to grant them summary judgment on the issue of

*liability* for Counts XI and XII against defendant Creamer.  *Id.*  But apparently, they have pared

their request.  Defendant Creamer explains in her Response (Doc. 111) that plaintiffs'

Memorandum in Support (Doc. 102) does not argue for summary judgment against Count XII

---

[16]     Defendant Creamer also asks the court to decline to exercise supplemental jurisdiction over
plaintiffs' state law claims.  *See* Doc. 95 at 29.  She premises this request on the assumption that the court
would grant summary judgment against all § 1983 claims.  *Id.*  But at least one federal claim survives
summary judgment, so the court denies defendant Creamer's request.

and that plaintiffs' counsel "has confirmed with Defendant Creamer's counsel that only the battery claim is the subject of Plaintiffs' motion." Doc. 111 at 1. Plaintiffs confirm that their "motion is only intended to address Count XI[.]" Doc. 112 at 1 n.1.

With that clarification in hand, the court considers plaintiffs' arguments for granting them summary judgment on the issue of defendant Creamer's liability for battery under Count XI. But first, the court recites the uncontroverted facts relevant to that analysis.

### 1.   Uncontroverted Facts

"In January 2019, Defendant Creamer was employed by Defendant U.S.D. 353 (the Wellington School District) as a paraeducator." Doc. 111 at 8 (DSOF ¶ 1) (citing Doc. 102-1 (Creamer Decl. ¶ 2)); Doc. 112 at 3. "On January 18, 2019, Ms. Creamer supervised some Wellington students who were transported to a basketball game in Wichita, Kansas, hosted by a YMCA." Doc. 111 at 8 (DSOF ¶ 2) (citing Doc. 102-1 (Creamer Decl. ¶ 3)); Doc. 112 at 3. "Reed Saunders was attending Wellington High School at the time and was one of the students who went to the game." Doc. 111 at 9 (DSOF ¶ 4) (citing Doc. 102-1 (Creamer Decl. ¶ 4)); Doc. 112 at 3.

Reed Saunders "is developmentally disabled, blind, non-verbal, has a seizure disorder, has cerebral palsy, and functions at the level of a 1- to 3-year-old." Doc. 102 at 3 (SOUF ¶ 8) (citing Doc. 102-3 (Saunders Decl. ¶ 3)); Doc. 111 at 8 (RPSOF ¶ 8). After Reed Saunders became angry and hit and clawed at defendant Creamer, she intentionally slapped his hand away. *See* Doc. 102 at 2 (SOUF ¶ 1) (citing Doc. 102-1 (Creamer Decl. ¶ 7)); Doc. 111 at 6 (RPSOF ¶ 1) (citing Doc. 102-1 (Creamer Decl. ¶¶ 6–7)).[17] "When she [slapped] him, she told him in a

---

[17]      The parties dispute whether slapping and striking differ. Defendant Creamer controverts any fact suggesting that she *struck* Reed Saunders because she only *slapped* him. Doc. 111 at 6. Plaintiffs assert that the two terms are synonymous, and that defendant Creamer fails to create a genuine dispute about any material facts. Doc. 112 at 3. On this motion by plaintiffs, the court must construe the facts in the

raised voice 'don't make me mad.'"  Doc. 102 at 3 (SOUF ¶ 2) (citing Doc. 102-1 (Creamer Decl. ¶ 10)); Doc. 111 at 6 (RPSOF ¶ 2).  Reed Saunders "was strapped into his wheelchair at the time of Creamer's conduct."  Doc. 102 at 3 (SOUF ¶ 7) (citing Doc. 102-1 (Creamer Decl. ¶ 5)); Doc. 111 at 8 (RPSOF ¶ 7).

"Defendant Creamer admitted to a Wichita Detective that she was wrong in [slapping Reed's hand]."  Doc. 102 at 3 (SOUF ¶ 3) (citing Doc. 102-1 (Creamer Decl. ¶ 18)); Doc. 111 at 6 (RPSOF ¶ 3) (first quoting Doc. 102-1 (Creamer Decl. ¶ 18); then citing Doc. 102-1 (Creamer Decl. ¶¶ 6–7)).  "Defendant Creamer [pleaded] guilty to battery arising from her [slapping] of Reed Saunders because she believed her conduct upon Reed Saunders was done in a 'rude, insulting or angry manner.'"  Doc. 102 at 3 (SOUF ¶ 4) (citing Doc. 102-1 (Creamer Decl. ¶ 20)); Doc. 111 at 7 (RPSOF ¶ 4).

### 2.  Discussion

Plaintiffs bring against defendant Creamer a claim for common law battery under Kansas law.  Now they seek summary judgment on the question of her *liability* for that tort claim.  Doc. 102 at 4.  Defendant Creamer objects, arguing that summary judgment is not proper because several issues of material fact about plaintiffs' battery claim remain and require a jury to determine.  Doc. 111 at 9.  *First*, defendant Creamer argues that the issue whether she was acting in the scope of her employment is a fact issue for the jury to decide.  Doc. 111 at 9–11.  *Second*, she argues that the issue whether she is liable for the tort of battery is a fact issue for the jury.  *Id.* at 11–12.  The court considers each argument.

---

light most favorable to defendant Creamer as the non-moving party.  *Scott*, 550 U.S. at 378.  It thus reads any references to striking Reed Saunders as she asserts:  that she *slapped his hand away*.  *See* Doc. 111 at 6 (citing Doc. 102-1 (Creamer Decl. ¶¶ 6–7)).

### a. Whether the Scope of Employment Question is a Genuine Issue of Material Fact

Defendant Creamer argues that the court should deny plaintiffs' summary judgment motion "because the 'scope of employment' issue cannot be determined by this [c]ourt as a matter of law.  It is clearly a question of fact for a jury."  Doc. 111 at 11 (citations omitted).  Defendant Creamer suggests that a defendant's conduct being beyond the scope of her employment is an "essential element" of plaintiffs' battery claim under Count XI.  Doc. 111 at 9.  Plaintiffs disagree, replying that this "scope of employment" question is, in fact, not relevant to the common law battery claim at issue (Count XI).  Doc. 112 at 3–4.  Plaintiffs reason that Kansas "common law does not speak to scope of employment as an element of the tort or even as an affirmative defense" and thus "scope of employment" "is immaterial to Plaintiff's summary judgment motion against [defendant Creamer]."  *Id.* at 4.

The court agrees with plaintiffs.  In Kansas, a common law civil battery "entails an unprivileged intentional touching with the purpose of bringing about a harmful or offensive contact."  *Est. of Randolph v. City of Wichita*, 459 P.3d 802, 817 (Kan. Ct. App. 2020); *see also* Doc. 111 at 11 (quoting *McElhaney v. Thomas*, 405 P.3d 1214, Syl. 1 (Kan. 2017)); Doc. 110 at 5 (quoting *Baker v. Hayden*, No. 120,334, 459 P.3d 834, 2020 WL 1313814, at *9 (Kan. Ct. App. Mar. 20, 2020)).  The fact that an employee acts outside of the scope of her employment does not appear relevant to whether she is liable for the tort of battery under the common law of Kansas.  It is not a genuine issue of material fact for this claim under Count XI.  This question about scope of employment does not preclude summary judgment.

The court now turns to defendant Creamer's second argument, that the question of her intent remains an issue for the jury.

**b.  Whether Defendant Creamer's Liability for Common Law Battery is a Genuine Issue of Material Fact**

Plaintiffs assert that they are entitled to summary judgment on the issue of defendant Creamer's liability for common law battery under Count XI.  Civil battery "entails an unprivileged intentional touching with the purpose of bringing about a harmful or offensive contact."  *Est. of Randolph*, 459 P.3d at 817.  Defendant Creamer asserts that the issue remaining for the jury is her *intent*.  Doc. 111 at 12.  She reasons that plaintiffs' summary judgment motion "should be overruled because Defendant Creamer's intent cannot be determined by this [c]ourt as a matter of law."  *Id.*

"The 'intent to injure' element of civil battery can be satisfied in alternative ways—either by (1) an intent to cause a harmful bodily contact, that is, to cause the other physical injury; or by (2) an intent to cause an offensive bodily contact, that is, to invade the other's reasonable sense of personal dignity."  *McElhaney*, 405 P.3d at 1221; *see also Fuerschbach v. Sw. Airlines Co.*, 439 F.3d 1197, 1209 (10th Cir. 2006) ("*Any* bodily contact is offensive 'if it offends a reasonable sense of personal dignity.'" (quoting Restatement (Second) of Torts § 19 (emphasis added)). "'All consequences which the actor desires to bring about are intended.'"  *Baska v. Scherzer*, 156 P.3d 617, 626 (Kan. 2007) (quoting Restatement (Second) of Torts § 8A cmt. b.).  So, a desire to invade another's reasonable sense of personal dignity is sufficient.

"Summary judgment is not ordinarily appropriate for settling issues of intent or motivation."  *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998).  But the Tenth Circuit has affirmed a district court's grant of summary judgment where the totality of the evidence is insufficient to raise a genuine doubt about defendant's motivation.  *See, e.g.*, *id.*  Here, the proffered evidence is likewise insufficient to raise a genuine issue about defendant Creamer's intent.  No reasonable juror could conclude from the facts construed in defendant

Creamer's favor that she did not desire to bring about offensive bodily contact when she slapped Reed Saunders's hand away.  Indeed, the undisputed facts show that this desired outcome was the whole point of slapping him.

Defendant Creamer acted in response to the boy's conduct—he had become angry and hit and clawed at defendant Creamer.  *See* Doc. 102 at 2 (SOUF ¶ 1) (citing Doc. 102-1 (Creamer Decl. ¶ 7)); Doc. 111 at 6 (RPSOF ¶ 1) (citing Doc. 102-1 (Creamer Decl. ¶¶ 6–7)).  She then intentionally slapped Reed Saunders's hand away.  *See* Doc. 102 at 2 (SOUF ¶ 1) (citing Doc. 102-1 (Creamer Decl. ¶ 7)); Doc. 111 at 6 (RPSOF ¶ 1) (citing Doc. 102-1 (Creamer Decl. ¶¶ 6–7)).  Her responsive actions and words reflect her attempting to deter the boy from engaging in that conduct again.  Doc. 102-1 at 2 (Creamer Decl. ¶ 10) ("I bent down to look him in the face and told him in a raised voice something to the effect of 'don't hit me.'").  "When she [slapped] him, she told him in a raised voice 'don't make me mad.'"  Doc. 102 at 3 (SOUF ¶ 2) (citing Doc. 102-1 (Creamer Decl. ¶ 10)); Doc. 111 at 6 (RPSOF ¶ 2).

Two more facts help rule out that the "slap" was accompanied by anything less than a desire to bring about an offensive touching or invade the reasonable sense of personal dignity of the student who had hit and clawed at her—a blind boy with cerebral palsy and severe mental disability strapped into a wheelchair.  *See* Doc. 102 at 3 (SOUF ¶ 7) (citing Doc. 102-1 (Creamer Decl. ¶ 5)); Doc. 111 at 8 (RPSOF ¶ 7; *see also* Doc. 102 at 3 (SOUF ¶ 8) (citing Doc. 102-3 (Saunders Decl. ¶ 3)); Doc. 111 at 8 (RPSOF ¶ 8).  "Defendant Creamer admitted to a Wichita Detective that she was wrong in [slapping Reed's hand]."  Doc. 102 at 3 (SOUF ¶ 3) (citing Doc. 102-1 (Creamer Decl. ¶ 18)); Doc. 111 at 6 (RPSOF ¶ 3) (first quoting Doc. 102-1 (Creamer Decl. ¶ 18; then citing Doc. 102-1 (Creamer Decl. ¶¶ 6–7)); *see also* Doc. 102-1 at 3 (Creamer Decl. ¶ 18) ("I was then (and still am now) remorseful for my conduct during that incident.").

"Defendant Creamer [pleaded] guilty to battery arising from her [slapping] of Reed Saunders because she believed her conduct upon Reed Saunders was done in a 'rude, insulting or angry manner.'" Doc. 102 at 3 (SOUF ¶ 4) (citing Doc. 102-1 (Creamer Decl. ¶ 20)); Doc. 111 at 7 (RPSOF ¶ 4).

Given all of the above facts, no reasonable juror could reach any conclusion other than finding that defendant Creamer responded to Reed Saunders's "hit and claw" by touching him (in a rude, insulting or angry manner) with the desire to bring about an offensive contact. To reach any other conclusion, one must disregard defendant Creamer's words and conduct during the incident, her description of the incident, and her words and conduct since the incident. Under these facts, no reasonable juror could find defendant Creamer not to have engaged in an unprivileged intentional touching of Reed Saunders with the purpose of bringing about a harmful or offensive contact. Plaintiff Reed Saunders is entitled to summary judgment on the issue of defendant Creamer's *liability* for common law battery under Count XI. The court thus grants plaintiffs' summary judgment motion (Doc. 101).

## V.   Conclusion

The court rules on the four pending dispositive motions. *First*, the court denies defendant USD 353's Motion to Dismiss (Doc. 92). *Second*, the court grants defendants Moore and Gray's Motion to Dismiss (Doc. 96) in part and denies it in part, as this Memorandum and Order specifies. *Third*, the court grants defendant Creamer's Motion for Summary Judgment (Doc. 94) in part and denies it in part, consistent with this Memorandum and Order. *Finally*, the court grants plaintiffs' summary judgment motion (Doc. 101), as this Memorandum and Order specifies.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant USD 353 Wellington's Motion to Dismiss (Doc. 92) is denied.

**IT IS FURTHER ORDERED BY THE COURT THAT** defendants Moore and Gray's Motion to Dismiss (Doc. 96) is granted in part and denied in part, consistent with this Memorandum and Order.  For defendant Moore, the court grants the Motion to Dismiss for Counts II, III, IV, and XII, but the court denies the Motion to Dismiss for Counts VII, IX, X, XI, and XIII.  For defendant Gray, the court grants the Motion to Dismiss for Counts III, VIII, X, XI, XII, and XIII, but the court denies the Motion to Dismiss for Counts I, V, IX.

**IT IS FURTHER ORDERED BY THE COURT THAT** defendant Creamer's Motion for Summary Judgment (Doc. 94) is granted in part and denied in part, consistent with this Memorandum and Order.  The court grants defendant Creamer summary judgment against Counts III and IV of the Third Amended Complaint, but denies summary judgment against Count II.

**IT IS FURTHER ORDERED BY THE COURT THAT** plaintiffs' summary judgment motion (Doc. 101) is granted, consistent with this Memorandum and Order.

**IT IS SO ORDERED.**

**Dated this 31st day of March, 2021, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**